[This opinion has been published in *Ohio Official Reports* at 81 Ohio St.3d 405.]

THE STATE OF OHIO, APPELLEE, *v*. SPIVEY, APPELLANT.

[Cite as *State v. Spivey*, 1998-Ohio-437.]

*Criminal law—Aggravated murder—Defendant competent to stand trial and enter pleas, when—Presentence motion to withdraw no contest pleas properly denied—XYY syndrome raised in mitigation phase—Mitigation not established under R.C. 2929.04(B)(3), when—Death penalty upheld, when.*

(No. 97-414—Submitted December 9, 1997—Decided April 22, 1998.)

APPEAL from the Court of Appeals for Mahoning County, No. 89 C.A. 172.

_____

{¶ 1} On January 3, 1989, Warren Spivey, appellant, broke into Veda Eileen Vesper's residence at 451 West Ravenwood Avenue in Youngstown, Ohio, attacked Vesper with a knife or knives, inflicting multiple stab and/or cut wounds, and brutally beat her to death. Appellant robbed Vesper of jewelry and other personal property and fled the scene in Vesper's automobile. Later that night, appellant was arrested by police in connection with the murder.

{¶ 2} On January 18, 1989, appellant was indicted by the Mahoning County Grand Jury for the aggravated murder of Vesper. Count One of the indictment charged appellant with the purposeful killing of Vesper during the commission of an aggravated robbery and/or aggravated burglary. In addition, Count One carried an R.C. 2929.04(A)(7) death penalty specification alleging that the murder was committed during the course of an aggravated robbery and/or aggravated burglary. Appellant was also indicted on one count of aggravated robbery, one count of aggravated burglary, and one count of grand theft of a motor vehicle. The case was assigned for trial to the courtroom of Judge Peter C. Economus.

{¶ 3} At his arraignment, appellant pled not guilty to the charges and specification set forth in the indictment. Thereafter, Judge Economus scheduled

trial for March 27, 1989. However, appellant was granted a continuance, and trial was rescheduled for September 6.

{¶ 4} On August 15, 1989, appellant requested an order allowing a defense expert to conduct DNA testing of certain items of bloodstained clothing (*i.e.*, a red sweatshirt and a black-and-white vest) that had been seized by police during a January 4, 1989 search of appellant's home. A hearing on the motion was conducted on August 21. Additionally, on August 21, the trial court granted the motion for scientific testing, ordered a continuance of the September 6 trial date, and rescheduled trial for September 25. The trial court also ordered, in two separate judgment entries (filed August 21 and August 29), that "[n]o further continuances shall be granted."

{¶ 5} On August 31, appellant moved to continue the September 25 trial date on the basis that the DNA testing had not been completed. On September 1, the trial court ordered the drawing of the special venire for the September 25 trial date. Defense counsel objected to the drawing of the venire, since the defense had not yet received the DNA test results. The trial court noted the objection and proceeded with the drawing of the special venire.

{¶ 6} On September 19 or 20, appellant entered a plea of not guilty and not guilty by reason of insanity, moved for an order for psychological or psychiatric evaluation in connection with the insanity plea, and requested the appointment of Dr. A. James Giannini to evaluate appellant's mental condition at the time of the offenses. See former R.C. 2945.39. On September 20, the trial court ordered the Forensic Psychiatric Center of District Eleven, Inc. (not Giannini) to conduct the examination of appellant. On September 21, appellant moved for the appointment of an independent forensic examiner (*i.e.*, Giannini or some other psychiatrist chosen by the defense) to evaluate appellant's mental condition at the time of the offenses. See former R.C. 2945.39(C). Also, on September 21, appellant filed yet

2

another motion for a continuance of the September 25 trial date. On September 22, appellant filed a "supplemental" motion for continuance.

{¶ 7} Prior to September 25, the Forensic Center issued a report by Dr. Stanley J. Palumbo, a psychologist, indicating that appellant was sane at the time of the offenses. On September 25, the trial court denied appellant's requests for a continuance and began the questioning of prospective jurors who had expressed a desire to be excused from service. On September 26, the trial court, pursuant to former R.C. 2945.39, appointed Giannini to conduct a psychiatric evaluation of appellant for purposes of the insanity plea. Giannini's psychiatric evaluation of appellant was completed on September 29, and Giannini apparently found appellant to be sane at the time of the murder and found him competent to stand trial.

{¶ 8} On October 2, 1989, appellant waived his right to trial by jury and elected to be tried by a three-judge panel. Appellant's signed jury waiver form was filed in the cause and made part of the record thereof in accordance with the requirements of R.C. 2945.05. Thereafter, on October 3, the members of the three-judge panel (Judges Economus, Jenkins, and McNally) were duly designated, and trial was set to commence October 10. On October 6, appellant moved for a continuance of the October 10 trial date pending the completion of the DNA testing.

{¶ 9} On October 10, the parties appeared in chambers before Judges Economus and McNally. The chambers discussion involved, among other things, a plea agreement that had been reached between the state and the defense. The discussions indicated that appellant had agreed to plead no contest to the charges and specification set forth in the indictment. In exchange, the state agreed that, during the penalty phase, the prosecution would be limited to cross-examination of defense witnesses and would not introduce independent evidence during mitigation except to rebut false or perjured testimony. Additionally, the state agreed to refrain from making any recommendation concerning the death penalty. Following these discussions, appellant appeared before the three-judge panel, withdrew his pleas of

not guilty and not guilty by reason of insanity, and entered a written plea of no contest to each count. Following an extensive Crim.R. 11 colloquy between the panel and appellant, the panel accepted appellant's pleas of no contest.

{¶ 10} On October 10, the panel conducted an evidentiary hearing to determine the underlying factual and evidentiary basis for the charges and specification alleged in the indictment. Evidence was presented to the panel through exhibits, stipulations, and the live testimony of several witnesses. At the conclusion of the hearing, the panel found appellant guilty of the charges and specification set forth in the indictment. On October 11, the panel filed a judgment entry reflecting its findings of guilt.

{¶ 11} The penalty phase was scheduled to commence October 30. On October 20 and 24, appellant moved for a continuance of the penalty phase, claiming that a critical defense witness would be unavailable from October 28 through November 5. Appellant also, on October 24, moved to withdraw his pleas of no contest on the basis of what appellant referred to as "newly discovered evidence." Attached to the motion was a report from Cellmark Diagnostics Laboratory. The report indicated that the blood on the two articles of clothing that had been seized by police during the search of appellant's home (*i.e.*, the red sweatshirt and the black-and-white vest) was not the blood of the victim. In contrast, the state's evidence at the October 10 hearing on appellant's pleas of no contest had included testimony that the blood on the clothing was consistent with the blood of the victim. However, the state's evidence in that regard had involved non-DNA testing procedures. Therefore, in light of the report from Cellmark, appellant sought to withdraw his pleas of no contest and requested that the panel vacate its findings of guilt and allow the case to proceed to trial by jury. On October 27, the panel denied appellant's motion to withdraw the pleas and reset the mitigation hearing for November 13.

{¶ 12} The mitigation hearing commenced November 13 and concluded on November 17. On November 20, 1989, the panel sentenced appellant to death for the aggravated murder of Vesper. For the offenses of aggravated robbery, aggravated burglary, and grand theft of a motor vehicle, appellant was sentenced in accordance with law. On appeal, the court of appeals, in January 1997, affirmed the judgment of the trial court and upheld appellant's death sentence.

{¶ 13} The cause is now before us on an appeal as of right.

_____

*Paul J. Gains*, Mahoning County Prosecuting Attorney, and *Janice T. O'Halloran*, Assistant Prosecuting Attorney, for appellee.

*John B. Juhasz* and *Patricia A. Millhoff*, for appellant.

_____

**DOUGLAS, J.**

{¶ 14} Appellant presents a number of issues for our consideration. (See Appendix, *infra*.) We have considered appellant's propositions of law and have reviewed the death sentence for appropriateness and proportionality. Upon review, and for the reasons that follow, we affirm the judgment of the court of appeals and uphold the sentence of death.

I

{¶ 15} We have held, in cases too numerous to cite, that this court is not required to address and discuss, in opinion form, each and every proposition of law raised by the parties in a death penalty appeal. We continue to adhere to that position today. Here, appellant raises a number of issues that have previously been addressed and rejected by this court under analogous circumstances in some of our prior cases. In addition, most of the arguments raised by appellant have been waived. Further, many of appellant's arguments merit no discussion given the events at trial and the governing law. Upon a review of the record and the arguments advanced by appellant, we fail to detect any errors requiring reversal of

appellant's convictions and death sentence.  We address and discuss, in detail, only those issues that merit further discussion.

II

{¶ 16} On October 2, 1989, appellant waived his right to trial by jury and elected to be tried by a three-judge panel.  Appellant executed a written jury waiver and the trial judge (Judge Economus) questioned appellant in open court, with counsel present, concerning the waiver.  The waiver was also signed by appellant's attorneys as witnesses.  The signed jury waiver form was filed in the cause and made part of the record.  The procedure fully complied with the requirements of R.C. 2945.05.  See *State v. Pless* (1996), 74 Ohio St.3d 333, 658 N.E.2d 766, paragraph one of the syllabus.

{¶ 17} In his first proposition of law, appellant contends that the trial court erred by accepting his waiver of the right to trial by jury.  Specifically, appellant contends that the trial court had information that appellant suffered from "numerous intellectual deficiencies" and that the court had an "absolute duty" to conduct a more thorough inquiry into whether appellant knowingly, intelligently, and voluntarily waived his right to trial by jury.  We reject appellant's argument in this regard.

{¶ 18} First, we note that the trial court strictly adhered to the requirements of R.C. 2945.05 and, thus, fully satisfied its duties with respect to appellant's jury waiver.  Second, not only did the trial court fully comply with R.C. 2945.05 in accepting the jury waiver, but the court also questioned appellant concerning the written waiver even though no such questioning was required.  See *State v. Jells* (1990), 53 Ohio St.3d 22, 25-26, 559 N.E.2d 464, 468 ("There is no requirement in Ohio for the trial court to interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial.  The Criminal Rules and the Revised Code are satisfied by a written waiver, signed by the defendant, filed with the court, and made in open court, after arraignment and opportunity to consult with

counsel."). See, also, *State v. Eley* (1996), 77 Ohio St.3d 174, 182, 672 N.E.2d 640, 649. At the time of the waiver, the trial court asked appellant in open court whether appellant understood that by waiving the right to trial by jury he would be tried by a three-judge panel. The trial court questioned appellant as to whether appellant understood that his guilt would have to be proven beyond a reasonable doubt. The trial court asked appellant whether appellant understood that the death sentence would be imposed if a three-judge panel unanimously found appellant guilty of aggravated murder and the attendant death-penalty specification and if the panel also unanimously found that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt. Appellant responded affirmatively to each question asked of him, indicating that he fully understood the consequences of the waiver. Additionally, the jury waiver form itself apprised appellant of the nature and consequences of his decision to waive a jury trial.

{¶ 19} Therefore, the record is clear that the trial judge at the time appellant waived the right to trial by jury strictly adhered to the requirements of R.C. 2945.05 and, in fact, went beyond the scope of the statute to ensure that appellant understood the nature and consequences of the waiver. The trial judge also specifically found, and we agree, that appellant's waiver of the right to trial by jury was "voluntarily made with full knowledge of the consequences thereof." Contrary to appellant's assertions, nothing more was required to have effectuated a valid waiver of the right to trial by jury.

{¶ 20} Accordingly, appellant's first proposition of law is not well taken.

III

**{¶ 21}** In his third proposition law, appellant contends that the three-judge panel erred by accepting the pleas of no contest without first inquiring into his competency. In this proposition, appellant does not assert that he was legally incompetent during the trial court proceedings but, instead, complains that the panel did nothing to determine whether he was competent to enter the pleas. Additionally, appellant contends that the panel's Crim.R. 11(C) inquiry into whether he understood the nature and consequences of the no contest pleas should have been more thorough. None of these issues was raised at trial or on appeal to the court of appeals. Thus, appellant has waived all but plain error with respect to these matters.

**{¶ 22}** Former R.C. 2945.37(A) provided that "[a] defendant is presumed competent to stand trial, unless it is proved by a preponderance of the evidence in a hearing under this section that because of his present mental condition he is incapable of understanding the nature and objective of the proceedings against him or of presently assisting in his defense." See, also, *Dusky v. United States* (1960), 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824, 825 (A defendant is competent to stand trial if the defendant " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' " and if the defendant " 'has a rational as well as factual understanding of the proceedings against him.' "). Additionally, "[t]he right to a hearing on the issue of competency rises to the level of a constitutional guarantee where the record contains 'sufficient indicia of incompetence,' such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial." *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433, 439.

**{¶ 23}** Here, appellant never specifically requested a hearing on the issue of competency. Nevertheless, appellant apparently argues that the trial court should have *sua sponte* conducted a hearing on the issue prior to accepting the pleas of no

contest.  However, appellant does not point to anything in the record indicating that he was incompetent at the time he entered the pleas of no contest, and our review of the record has revealed no indicia of incompetency that would have required a hearing on that matter.

{¶ 24} Appellant also argues that the panel "put on the blinders to any issue of competence" and told defense counsel that "it [the panel] had better not see a motion for competence."  However, appellant's assertions are not supported by the record.  Appellant has provided us with no citation to the record where defense counsel was allegedly told not to request a hearing regarding competency.  Additionally, we have independently reviewed the entire record and find that no such comment was made.  Moreover, even if the comment had been made, it was still the responsibility of counsel to raise the issue of competency if counsel truly believed that competency was an issue.  The record does reflect that when an issue concerning appellant's sanity arose while the case was pending before Judge Economus, defense counsel made appropriate motions for sanity evaluations and the appropriate examinations were conducted.  A report of one of the examinations specifically included a finding that appellant was competent to stand trial.  Further, appellant had previously been examined by a psychologist in 1988 in connection with an unrelated criminal case, and the report of that examination indicated that appellant was not only competent to stand trial, but that he understood the notion of plea bargaining.  We have no doubt whatsoever that if appellant's trial attorneys in the case at bar had any reason to believe that appellant was legally incompetent, they would have filed an appropriate motion to request a hearing on the issue of appellant's competency.

{¶ 25} Appellant also argues that the panel was required to do more than it did during its Crim.R. 11(C) colloquy with appellant to ensure that he understood the nature and consequences of his pleas.  We disagree.  The record is clear that appellant manifestly understood the consequences of entering his pleas of no

contest. Indeed, when appellant submitted his written plea to each count to the panel, defense counsel informed the panel that he (counsel) had "gone over it [the written plea] in its entirety and read it to my client." Counsel also stated that appellant "questioned me about various parts about it and I answered his questions." The panel then proceeded to address appellant personally as required by Crim.R. 11, and the panel adhered meticulously to all relevant requirements of that rule. See Crim.R. 11(C)(2) and (3). In this regard, we are absolutely convinced that the panel did not err by accepting appellant's pleas of no contest. The Crim.R. 11 dialogue between the panel and this appellant was more than adequate to ensure that he knew the consequences of his pleas (including the consequences relating to a waiver of a jury trial) and that the pleas were knowingly, intelligently, and voluntarily made.

{¶ 26} Accordingly, for the foregoing reasons, appellant's third proposition of law is not persuasive.

IV

{¶ 27} The subject of appellant's fourth proposition of law concerns the panel's decision denying appellant's motion to withdraw the pleas of no contest. The facts giving rise to this proposition of law may be summarized as follows.

{¶ 28} During the January 1989 search of appellant's home, police seized, among other things, two bloodstained articles of clothing, *i.e*., a red sweatshirt and a black-and-white vest. The bloodstained clothing was sent to the Ohio Bureau of Criminal Identification and Investigation ("BCI") for testing. In January 1989, BCI performed scientific testing procedures (but not DNA testing) with respect to the bloodstains. The testing by BCI indicated that the blood on the clothing was consistent with the blood of the victim but was not consistent with appellant's blood.

{¶ 29} On May 17, 1989, during a pretrial status conference, Assistant Prosecutor Kenneth Bailey asked defense counsel, "Is there a request for DNA Testing at this time?" The question apparently arose in connection with the articles

of clothing found in appellant's residence. In response, defense counsel stated, "No, we are not asking for anything, but that this hearing be reconvened once we get a chance to discuss the matters which [Mr. Bailey] is aware of by us putting this on the record."

{¶ 30} Over two months later, during a July 19 motions hearing, defense counsel stated that he had discussed DNA testing with Bailey (who at that point was no longer involved in the case) and that Bailey had apparently indicated that the state intended to conduct DNA testing. During the hearing, defense counsel asked Assistant Prosecutor Gessner whether the state had conducted or was planning to conduct DNA testing with respect to the bloodstained articles of clothing. In response, Gessner stated that no DNA testing had been conducted by the state and that the state had no intention to conduct any DNA testing. At that point, Judge Economus stated, "I think we ought to settle this once and for all. A written response would be the appropriate way to handle it."

{¶ 31} On August 15, 1989, three weeks before the case was scheduled to proceed to a jury trial on September 6, appellant filed a motion to allow a defense expert to conduct DNA testing of the bloodstains found on the sweatshirt and the vest that had been seized from appellant's residence. On August 21, Judge Economus conducted a hearing on the motion. During the hearing, defense counsel argued that the DNA testing was "critical" to the defense. Defense counsel also requested a continuance of the September 6 trial date and explained to the court, during an *ex parte* hearing, why the defense had delayed filing its motion for scientific testing. The record reveals that the defense had delayed filing the motion until the state, on August 2, 1989, specifically committed in writing that no DNA testing had been conducted in the case. Additionally, defense counsel informed the court that counsel had only recently become aware that DNA testing was imperative to appellant's defense.

{¶ 32} The trial judge granted the motion for DNA testing and stated, during the August 21 hearing, that "[o]bviously, we can't proceed with the trial until the results are completed * * * and returned to defense counsel, and the prosecution is entitled to an opportunity to review the tests." On August 21, the trial judge ordered a continuance of the September 6 trial date and rescheduled trial for September 25. The trial judge also ordered that no further continuances would be granted. Following the August 21 hearing, the bloodstained articles of clothing, along with blood samples from the victim, were sent to Cellmark Diagnostics Laboratory, an expert chosen by the defense, for DNA analysis.

{¶ 33} On August 31, 1989, appellant moved for a continuance of the September 25 trial date pending the results of the DNA testing. In support of the motion, appellant argued that the DNA test results were "critical from the point of voir dire on to the conclusion of said trial." On September 1, appellant objected to the drawing of the special venire, since the defense had received no further information concerning the DNA testing. The trial court noted the objection but proceeded with the drawing of the venire. On September 21, appellant filed another motion for a continuance of the September 25 trial date. On September 22, appellant filed a supplemental motion for continuance of the jury selection process that was scheduled to commence September 25, claiming that "[i]t is impossible for the Defendant to voir dire a jury without knowledge as to the results [of the DNA testing procedures]."

{¶ 34} On September 25, defense counsel argued during a pretrial hearing that the defense should not be required to proceed to voir dire without knowing the results of the DNA testing. At that time, defense counsel also indicated that the defense would consider waiving the right to trial by jury if the DNA test results showed that the blood on the articles of clothing found in appellant's residence was consistent with the blood of the victim. The trial court denied appellant's request for a continuance of the jury selection process, finding that the DNA test results

were not critical for purposes of voir dire. The trial judge then proceeded to address the venire and began questioning prospective jurors who had expressed a desire to be excused from service. During a break, defense counsel informed the court that there was a problem with the DNA testing because Cellmark had not been provided with the correct vial of the victim's blood. When court adjourned for the day, the parties' attorneys apparently conducted a conference call with Cellmark to determine precisely what it needed to complete the DNA testing.

{¶ 35} On October 2, 1989, court convened in chambers and a discussion was had relative to the terms of the plea agreement entered into between the state and the defense. Defense counsel informed the court that appellant would waive his right to trial by jury and, once a three-judge panel was designated, that appellant would enter either a guilty or no contest plea. Defense counsel also informed the court that, in exchange for the pleas, the state had agreed not to make any recommendation concerning the death penalty and had also agreed to refrain from offering any rebuttal witnesses during the penalty phase unless rebuttal was necessary to counteract false or perjured testimony by defense witnesses. Following the discussion, appellant appeared in open court and waived his right to trial by jury. The members of the panel were thereafter designated and trial was set to commence October 10.

{¶ 36} On October 6, appellant moved for a continuance of the October 10 trial date, since DNA testing was being conducted by Cellmark but the results were not yet available. On October 10, the parties appeared in chambers before two members of the panel (Judges Economus and McNally) and the terms of the plea agreement were once again stated on the record. During the hearing, Judge Economus questioned defense counsel regarding the October 6 motion for a continuance. Specifically, Judge Economus indicated that he was perplexed by the motion, since a decision had been made by appellant to waive a jury trial and to enter pleas of no contest. Judge Economus stated that he had assumed that the issue

concerning DNA testing had been "abandoned." Judge Economus also stated, "I would—and I want the record to be clear on this—this Court would use every effort, and I [previously] indicated this in concert with the prosecution and the defense counsel, to have that evidence [the DNA test results] available before the actual trial of this case." Defense counsel replied that the defense had not abandoned the DNA testing and that counsel was simply attempting to reiterate, at every possible point, the need for the DNA test results. Judge Economus then stated, "I don't want it to appear that the only reason you are pleading this afternoon is because the Court denied your request for a continuance because you haven't received the pertinent evidence for the defense of your case." In response, one of appellant's defense attorneys, stated:

"Your Honor, last Monday [October 2, 1989], we were to begin once again—and that's when we were going to go forward [with voir dire], and that's when we waived the jury trial. We didn't do that to buy time, we did that because we thought that was the right thing to do. So, the Court's statement o[f] concern, that that's the only reason that we are pleading, because we don't have this [the DNA test results], that is not the only reason. It is a consideration, however. * * *

"Your Honor, Mr. Zena [co-counsel] just mentioned to me, and we had discussed this earlier, that the main reason we are going [*sic*, doing] this is because of the Rule 11 negotiations. And, of course, we're considering this other situation in making the decision that we made."

{¶ 37} During further discussions concerning DNA testing, Judge Economus emphasized that although he had refused to delay the voir dire proceedings on September 25, he would not have forced the defense to begin the presentation of evidence without the DNA test results.

{¶ 38} Following the October 10 discussions in chambers, appellant appeared in open court and voluntarily entered his pleas of no contest. Thereafter, the panel conducted an evidentiary hearing to determine the factual and evidentiary

14

basis of the charges and specification alleged in the indictment. During the evidentiary hearing, the state presented, among other things, the testimony of BCI trace evidence expert Kenneth Ross. Ross testified that the bloodstains found on the sweatshirt and the vest were consistent with the victim's blood. Following the presentation of additional evidence, the panel found appellant guilty as charged in the indictment.

{¶ 39} On October 24, after the panel had entered its findings but prior to the commencement of the penalty phase, appellant filed a motion to withdraw his pleas of no contest and requested that the panel "reinstate a jury trial." The basis for the motion was what appellant described as "newly discovered evidence," *i.e.*, the DNA analysis from Cellmark, which indicated that the bloodstains on the sweatshirt and the vest could not have originated from the victim. Apparently, the DNA analysis had been received by the defense on October 21, 1989. On October 26, the panel conducted a hearing on appellant's motion. On October 27, the motion was denied.

{¶ 40} In his fourth proposition of law, appellant argues that the panel abused its discretion by denying his presentence motion to withdraw the pleas and to proceed to a jury trial. We disagree.

{¶ 41} Crim.R. 32.1 provides:

"A motion to withdraw a plea of guilty or no contest may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his plea."

{¶ 42} In *State v. Xie* (1992), 62 Ohio St.3d 521, 584 N.E.2d 715, paragraphs one and two of the syllabus, this court held:

"1. A defendant does not have an absolute right to withdraw a guilty plea prior to sentencing. A trial court must conduct a hearing to determine whether there is a reasonable and legitimate basis for the withdrawal of the plea.

"2. The decision to grant or deny a presentence motion to withdraw a guilty plea is within the sound discretion of the trial court."

**{¶ 43}** Although *Xie* clearly dealt with presentence motions to withdraw guilty pleas, the holdings in *Xie* may also be applied in situations involving pleas of no contest. Thus, the panel's decision denying appellant's presentence motion to withdraw the pleas of no contest will not be disturbed absent an abuse of discretion. We find no abuse of discretion here. In its October 27, 1989 judgment entry denying appellant's motion to withdraw the pleas and to reinstate a jury trial, the panel stated:

"Defense counsel argue that these results [the DNA test results] are newly discovered evidence which could not have been discovered prior to trial and that said evidence is sufficient to rebut a critical piece of identifying evidence used by the prosecution. Further, Defense counsel argue that the previously submitted BCI Lab Test result was the sole direct identifying evidence in the case upon which the Defendant's conviction is based, and now, under DNA Testing, is negated and instead tends to exculpate the Defendant.

"Regarding the first assertion, the record does not support this contention. The existence or commencement of the testing was admittedly known and initiated by the Defense at the time the trial was called [for trial on September 25, 1989]. In fact the record clearly reflects the Court's intention not to proceed with testimony [at the scheduled jury trial] until the test results were completed. Counsel were aware of the Court's position, and with the option of proceeding with trial available to them, the Defense opted to withdraw their demand for a Jury Trial and proceed with a trial before [a three-judge panel]. Additionally the Defense chose to withdraw the plea of Not Guilty and to then enter the plea of No Contest. Counsel stated that the lack of DNA Testing results were [*sic*] only one factor in their decision to proceed upon a plea of No Contest and that their main reason for

entering the plea of No Contest was to preserve and protect the Criminal Rule 11 negotiations entered into between the Defense counsel and the prosecution.

"The possibility for the submission of the DNA results remained and existed, but the lack thereof was not the overriding decision to proceed with the plea of No Contest. As a result it would be incorrect to classify this evidence as newly discovered.

"Further considering the sufficiency of the DNA Test results, the Court does not find that [that] is sufficient to rebut the identifying evidence offered by the prosecutor, nor is it the sole identifying piece of evidence linking the Defendant to the crimes convicted. * * * [E]ven if the Court would consider the existence of the DNA test results, the evidence previously considered by the Court overwhelmingly establishes the Defendant's guilt of all charges beyond a reasonable doubt.

"* * *

"Prior to the acceptance of the plea, the Court made an extensive and detailed inquiry of the Defendant to assure the Court that the plea was knowingly, intelligently, and voluntarily made. Therefore, the Court finds that the Defendant's plea was unequivocally and unconditionally made with full knowledge of its effect and consequence."

{¶ 44} Appellant contends, and we agree, that a presentence motion to withdraw a plea of no contest should be freely and liberally granted. However, the determination whether to grant or deny such a motion is a matter committed to the sound discretion of the trial court. Here, the panel found that the circumstances of this case did not warrant granting appellant's motion to withdraw his pleas of no contest. Based on a review of the record and a careful consideration of the arguments advanced by appellant, we find that the panel did not abuse its discretion in denying appellant's motion to withdraw his pleas and to reinstate a jury trial.

{¶ 45} At the time appellant waived his right to a jury trial, and at the time he entered his pleas of no contest, appellant was manifestly aware of the existence

of the DNA testing and that the results of the testing were not yet available. Appellant was also clearly aware at the time of the jury waiver, and at the time he entered his pleas, that there was a chance the DNA test results would be favorable to the defense. However, despite this knowledge, and with the option of proceeding to trial, appellant chose to waive his right to a jury trial and entered his pleas of no contest. The panel found that defense counsel was aware, at all relevant times, that the DNA test results would have been available to appellant prior to any witness testimony if appellant had elected to proceed to trial. Additionally, the record reveals that the main reason appellant entered the pleas of no contest was to take advantage of plea bargaining negotiations. Thus, the absence of the DNA test results was not the overriding reason appellant proceeded upon the pleas of no contest. Moreover, as the panel found, the evidence supporting appellant's convictions was overwhelming regardless of the DNA test results. Appellant's jury waiver and his pleas of no contest were knowingly, voluntarily, and intelligently made with full knowledge of the consequences, and the panel's decision to deny appellant's motion was not unreasonable, arbitrary, or unconscionable.

{¶ 46} Accordingly, for the foregoing reasons, we reject appellant's fourth proposition of law.

V

{¶ 47} In his second proposition of law, appellant complains of several instances where he was allegedly deprived of the effective assistance of trial counsel. Upon a review of the record, and having considered each and every instance of alleged ineffective assistance of trial counsel raised by appellant, we find that appellant has failed to satisfy his burden of establishing ineffective assistance of counsel under the standards set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. We discuss, in detail, only those instances of alleged ineffective assistance of counsel that warrant further analysis.

{¶ 48} Appellant argues that his trial attorneys erred in delaying the request for DNA testing. However, at the August 21, 1989 hearing on appellant's motion for scientific testing, defense counsel informed the court of the reasons for the delay. Defense counsel informed the court that it was a "big decision" for them to go forward with the testing. The state's evidence from BCI had indicated that the blood on the sweatshirt and the vest was consistent with the blood of the victim. If DNA testing confirmed that result, trial counsel indicated that appellant had no plausible defense. Conversely, if the DNA testing refuted the BCI blood analysis, trial counsel indicated that appellant would have a much stronger case. The transcript of the August 21 hearing also indicates that defense counsel made a tactical decision to proceed with DNA testing based upon the evidence that was available to them at that time. While it may have been better for defense counsel to have requested the DNA testing at an earlier date, it was not unreasonable for counsel to have waited to gather all the information available before making their tactical decision to request DNA testing.

{¶ 49} In this proposition, appellant also contends that the terms of the plea agreement were never discussed in open court, in violation of Crim.R. 11(F), and that "[c]ounsel was ineffective for failing to ever raise an objection as to the manner in which the negotiated plea was placed before the trial court." We agree that the manner in which the negotiated plea agreement was placed before the panel violated Crim.R. 11(F), which requires that, in felony cases, "the underlying agreement upon which the plea is based *shall* be stated on the record in *open court*." (Emphasis added.) Here, the plea agreement was not discussed in open court. However, the terms of the plea agreement were stated on the record during an October 2, 1989 chambers conference attended by the parties and Judge Economus prior to appellant's jury waiver, and Judge Economus subsequently served as the presiding member of the three-judge panel. On October 10, 1989, the plea agreement was also discussed in chambers before two members of the panel

(Judges Economus and McNally), with all parties present, and the terms of the agreement were placed on the record.  Therefore, although Crim.R. 11(F) was technically violated, since the terms of the plea were stated on the record *in chambers*, rather than being stated on the record in *open court*, we fail to see how appellant was prejudiced by the technical violation of the rule.  All parties and the court were aware of the agreement, and the agreement was adhered to by the parties.

{¶ 50} Appellant also contends that "to permit a capital defendant to plead no contest when no benefit is received for the plea is prima facie evidence of ineffective assistance."  In this regard, appellant implies that the plea agreement was essentially one-sided, favoring only the prosecution, and that appellant did not receive anything in return for his pleas.  However, we find that appellant did receive what he bargained for in exchange for the pleas, *i.e.*, the state agreed not to make any recommendation concerning appellant's sentence and agreed not to vigorously challenge defense witnesses during the penalty phase unless the witnesses perjured themselves.   The state complied with the terms of the negotiated plea.[1] Additionally, defense counsel knew that if the panel accepted the pleas of no

1. The question whether the state complied with the terms of the negotiated plea agreement is the subject of appellant's tenth proposition of law.  In that proposition, appellant claims that the state repeatedly violated the plea agreement during closing arguments in the penalty phase.  For instance, appellant claims that "[d]uring his closing argument to the [panel], the state argued that the court ought not to consider mercy in this case," and that "[l]ater the prosecution argued, 'an eye for an eye.' "  Appellant then claims that "[i]t is extremely difficult to understand how these arguments do not constitute a recommendation for the death penalty."  However, a review of the record reveals that the prosecutor never actually made the arguments appellant has attributed to him.   The prosecutor did not argue that the panel "ought not to consider mercy," but did argue that mercy was forgiveness, and forgiveness was not justice, and that the victim's family expected justice, not mercy.  Defense counsel objected to this statement and the panel indicated that it would disregard the prosecutor's comments.  The prosecutor also never uttered the phrase "an eye for an eye," but instead stated, "[i]f one taketh another captive, then to *captivity* he must be taken."  (Emphasis added.)  The defense objected to the prosecutor's comment in this regard, and the panel admonished the prosecutor for having made the comment.  In any event, the fact remains that the prosecutor never specifically recommended imposition of the death sentence in this case and thereby adhered to the terms of the plea agreement.  Furthermore, even assuming, *arguendo*, that the comments made by the prosecutor did somehow violate the terms of the plea agreement, there is absolutely no indication in the record that the panel was influenced by or considered these comments in arriving at its sentencing decision.

contest, the panel could dismiss the R.C. 2929.04(A)(7) death penalty specification pursuant to Crim.R. 11(C)(3). Therefore, the no contest pleas provided appellant with a chance to avoid the death sentence, and defense counsel specifically requested a dismissal of the specification after the panel had accepted the pleas. Defense counsel also knew that if the case had proceeded to trial on the issue of guilt or innocence, the finder of fact would have heard a detailed account of all the facts and circumstances surrounding the crimes, including the disturbing details regarding the killing and the manner of the victim's death. In contrast, the pleas of no contest essentially permitted appellant to proceed to mitigation on a relatively brief, cold, and sanitized record of the events. The decision not to contest the charges was a tactical decision that, in our judgment, was both reasonable and practical in light of the evidence of appellant's guilt. Appellant's suggestion that the plea agreement was one-sided and that he did not receive anything in return for the pleas is simply not supported by the record.

{¶ 51} Therefore, as previously stated, we find that appellant has failed to meet his burden of establishing ineffective assistance of counsel under the standards set forth in *Strickland.* Accordingly, we reject appellant's second proposition of law.

VI

{¶ 52} Having considered appellant's propositions of law, we must now independently review the death sentence for appropriateness and proportionality. Appellant purposely killed Vesper while committing an aggravated robbery and an aggravated burglary. We find that the specification of the aggravating circumstance appellant was found guilty of committing (R.C. 2929.04[A][7]) was proved beyond a reasonable doubt.[2]

{¶ 53} In mitigation, appellant presented the testimony of family members and other witnesses. Dana Hill, appellant's mother, testified that appellant was born July 21, 1969. According to Dana, appellant was a "slow" learner in almost everything he did as a child. When appellant was a toddler, he was hospitalized on forty or fifty different occasions for convulsions. During appellant's childhood, Dana felt that he was interfering with her life because of his various medical and behavioral problems. Her resentment of appellant eventually led to verbal and

2. R.C. 2929.04(A) provides that "[i]mposition of the death penalty for aggravated murder is precluded, unless one or more of the following [*i.e.*, the statutory aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8)] is specified in the indictment or count of the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt[.]" R.C. 2941.14(B) provides that "[i]mposition of the death penalty for aggravated murder is precluded unless the indictment or count in the indictment charging the offense specifies one or more of the aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code. *If more than one aggravating circumstance is specified to an indictment or count, each shall be in a separately numbered specification * * *.*" (Emphasis added.)

In the case at bar, Count One of the indictment charged appellant with the aggravated murder of Vesper. Specification One to Count One alleged that appellant committed the murder during the course of an aggravated robbery and/or aggravated burglary. This R.C. 2929.04(A)(7) death penalty specification was the only specification set forth in the indictment. We note, in passing, that two R.C. 2929.04(A)(7) specifications of aggravating circumstances could have been alleged in the indictment, *i.e.*, one specification premised on appellant having killed Vesper during the course of an aggravated robbery, and an entirely separate specification premised on appellant having killed Vesper during the course of an aggravated burglary. However, if more than one aggravating circumstance was intended to be specified, the indictment should have contained two separate specifications. The fact that there was only one specification means that, for purposes of our review, we consider only one aggravating circumstance. We find that the state proved, beyond a reasonable doubt, the commission of the aggravated robbery and aggravated burglary that served as the basis for the capital specification in this case. That single specified aggravating circumstance will be weighed against the evidence in mitigation.

physical abuse. Appellant's father also physically abused him and Dana. Dana testified that, at some point, she stopped seeking medical care and treatment for appellant's convulsions and, as he matured, his seizures began to manifest themselves in forms of rage and anger. Dana also testified that appellant constantly got into trouble at home and at school, but that she did very little to address the problem. She testified further that, during appellant's childhood, she told him that she hated him and wished that he had never been born. Dana also provided testimony relating to other aspects of appellant's history and background.

{¶ 54} Natasha V. Spivey, appellant's sister, testified that her parents treated appellant more harshly than they treated her and her brother Mark. According to Natasha, whenever she, Mark, and appellant got into trouble, appellant was always the most severely punished. Natasha testified further that appellant loved their father and that appellant attempted to act like him. Natasha also testified concerning an incident where her parents got into a fight and her mother was injured and went to the hospital.

{¶ 55} Wanda Daniels, appellant's cousin, testified that she had grown up with appellant and that she and appellant had been close friends. According to Daniels, appellant was treated as an outcast by other family members throughout his childhood. Daniels testified that appellant got into trouble as a child because he could not control his impulses. Daniels also described an incident where she and appellant, who was six or seven years old at the time, had been raped by Daniels's uncle.

{¶ 56} Mary Stewart was appellant's probation officer in 1985. Stewart testified that, in 1985, appellant was immature for his age, was experiencing behavioral problems at school and at home, and was in need of long-term counseling. Stewart testified further that she had made certain recommendations regarding the type of care that was needed for appellant, but that his family failed to follow through with Stewart's recommendations.

{¶ 57} Kathy Gillardi was a social worker for the Mahoning County Children's Services Board in 1982 and 1983. In 1981, appellant had been referred to the Youth Services Unit of the Youngstown Hospital Association to determine the cause of his behavioral problems at school. Gillardi initially became involved with appellant's family in 1982 when appellant's parents removed him from the hospital before a complete evaluation could be conducted. According to Gillardi, appellant's family was very resistant to the services offered for his care and treatment. In 1982, Gillardi was successful in having appellant readmitted to the Youth Services Unit, but his parents once again removed him from the hospital. In 1983, Gillardi was successful in receiving some cooperation from appellant's parents in having him evaluated. At that time, testing of appellant indicated that he suffered from, among other things, severe auditory problems. Additionally, in 1983, appellant was admitted to the Youth Services Unit for a complete evaluation. Following the evaluation, Dr. Joseph A. Abrams made numerous recommendations for appellant's care and treatment, including medication, further evaluation, and family counseling. Gillardi testified that appellant's parents remained resistant to professional services and that they never followed through with various recommendations for his continued care and treatment.

{¶ 58} Dr. Abrams, a developmental pediatrics specialist, testified that he had diagnosed appellant in 1983 as having XYY Syndrome, a genetic chromosome abnormality. According to Abrams, individuals with XYY Syndrome tend to be tall and thin, have less muscle development than an average person, tend to have learning problems, and have minor congenital abnormalities. Abrams testified that there is an increased risk of behavioral problems associated with XYY Syndrome. According to Abrams, XYY Syndrome does not itself result in mental disease, but "results in an increased risk for mental disease." Abrams testified further that appellant's chromosome abnormality placed him at risk for committing criminal acts, but that the syndrome itself did not cause him to be aggressive and to commit

violent acts. Rather, Abrams indicated that family environment plays a vital role in whether a person with XYY syndrome is likely to engage in criminal behavior. In this regard, Abrams testified that appellant "did not have a fair shake either from mother nature or from the environment." Abrams concluded that "[t]he combination of the two factors, his genetics, the family, and failure of the environment to fulfill his needs leads to his criminal behavior and violent behavior." Abrams also indicated that when he examined appellant in 1983, appellant was not aggressive and was capable of controlling his impulses. In addition to diagnosing XYY Syndrome, Abrams diagnosed appellant in 1983 as suffering from "[c]onduct disorder, unsocialized, nonaggressive," "[d]evelopmental language disorder, receptive type," and "[a]ttention deficit disorder without hyperactivity."

{¶ 59} Dr. James R. Eisenberg, a court-appointed clinical and forensic psychologist, also testified in mitigation. Eisenberg first interviewed appellant in October 1989. Between that time and the time of the mitigation hearing, Eisenberg interviewed appellant on several occasions, performed psychological testing, reviewed appellant's extensive records, and, it seems, interviewed members of his family. Eisenberg testified that appellant has a full scale I.Q. of 74, which, according to Eisenberg, indicated that appellant was "in the borderline range of intelligence." Eisenberg also performed testing to determine appellant's adaptive level of functioning, and concluded that "[i]ntellectually we are looking at someone who is basically functioning much like a ten year old." Eisenberg reviewed appellant's prior hospital records and various other reports and information concerning appellant. Eisenberg testified that appellant's records showed or consistently showed the presence of XYY Syndrome, conduct disorder, developmental language disorder, attention deficit disorder, learning problems, temporal lobe seizures, minimal brain dysfunction, juvenile arthritis, and the possibility of latent schizophrenia.

**{¶ 60}** Eisenberg diagnosed appellant as suffering from an attention deficit disorder, "alcohol and marijuana abuse, possible dependency," and a "borderline personality disorder with schizoid and anti-social features." Eisenberg testified that, in his opinion, "in a variety of settings, based on all the conditions that [appellant] carries with him, those conditions render him substantially impaired in specifically controlling impulse." Eisenberg was then asked the following questions, and gave the following responses, concerning the existence of the R.C. 2929.04(B)(3) mitigating factor:

"Q. Doctor, based upon your clinical and psychological evaluation of Warren Spivey, and all of the other materials and all of the information available to you, do you have an opinion based on reasonable scientific certainty as to whether or not Warren Spivey at the time of the commission of this offense, because of a mental disorder situation or defect, [lacked] substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law?

"A. Yes, I have an opinion.

"Q. Will you tell us what that opinion is, doctor?

"A. What I would like to do is break it down into three areas. The first area that you asked is if he is suffering from a substantial mental illness or defect.

"Q. Yes, mental disorder or defect?

"A. My opinion is that he is suffering from a number of defects, which together, create the equivalent of a mental defect, his limited intelligence, his borderline personality functions, his attention deficit disorder and subsequent problems cause all of those things, and including alcohol and marijuana abuse, in my opinion he was suffering from those conditions on the day in question. The second part of that question is whether or not he understands the criminality of his conduct, in other words, the wrongfulness. My opinion is that he did understand.

"Q. That he did understand?

"A. That he did understand the criminality of his conduct, yes. I think he was in a position to know what he was doing and to know what he was doing was wrong. The third part of that question is if he has a substantial impairment, in other words, if he was unable to conform his conduct.

"Q. Lack of substantial capacity to conform?

"A. My opinion is that he does have or he lacks the capacity to conform his conduct to the requirements of the law because of those defects."

{¶ 61} Eisenberg was questioned extensively on cross-examination, but was asked only a few questions directly relating to the R.C. 2929.04(B)(3) mitigating factor. On cross-examination, the prosecutor asked Eisenberg, "Are you suggesting to this Court that on January 3, 1989, or 4th, when he took the life of Mrs. Vesper, in that particular time frame he could not control his behavior?" In response, Eisenberg stated, "No, I'm not saying that." The prosecutor then asked Eisenberg what, if anything, Eisenberg knew concerning the killing that led him to conclude that appellant may have acted impulsively. Eisenberg responded to the question by indicating that he was aware of, among other things, appellant's version of the killing and "all of the records that precede that event that establish the foundation for his disorder." The prosecutor also asked Eisenberg a series of questions concerning the murder in an attempt to show that appellant had not acted impulsively in beating his victim to death and in stealing, among other things, the victim's car and the title to the car. Later, during closing arguments in the penalty phase, the prosecutor stated, "No one questions whether or not Warren Spivey may have lacked substantial capacity to conform his conduct to the law." However, the prosecutor also argued that "if you do not have a mental disease or mental defect, whether or not one can conform is irrelevant."

{¶ 62} Upon a review of the evidence presented in mitigation, it is clear to us that appellant had a very difficult and troubled childhood. He was plagued by physical and mental problems or deficiencies, had difficulties in school, suffered

parental rejection at an early age, was raised in an unsupportive family environment, was treated as an outcast by certain family members, was physically and verbally abused by his parents, and was sexually abused on at least one occasion. We find that appellant's troubled childhood, history, and family background are entitled to some weight in mitigation.

{¶ 63} The nature and circumstances of the offense reveal nothing of any mitigating value. Additionally, appellant presented no evidence regarding the mitigating factors set forth in R.C. 2929.04(B)(1), (2), (5) and (6), and our review of the record clearly reveals that these factors are inapplicable here. We have considered the youth of the offender (appellant was nineteen years old at the time of the offense) and find that this R.C. 2929.04(B)(4) factor is entitled to some weight in mitigation.

{¶ 64} The mitigating factor set forth in R.C. 2929.04(B)(3) is "*[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity* to appreciate the criminality of his conduct or *to conform his conduct to the requirements of the law*." (Emphasis added.) Dr. Eisenberg testified as to the existence of the R.C. 2929.04(B)(3) mitigating factor in this case. Specifically, Eisenberg testified that, at the time of the killing, appellant's combined psychological conditions rose to the level of (or were equivalent to) a mental defect and that, because of the defect or defects, appellant lacked substantial capacity to conform his conduct to the requirements of the law. Although Eisenberg's testimony on cross-examination casts significant doubt on the issue of whether appellant lacked substantial capacity to control his behavior at the time of the offense, we find that Eisenberg's testimony on direct examination was absolutely clear as to his belief that appellant lacked substantial capacity to conform to the requirements of the law at the time of the killing due to the combined effects of appellant's diagnosed conditions.

**{¶ 65}** The panel and the court of appeals determined that appellant had *not* established the existence of the R.C. 2929.04(B)(3) mitigating factor in this case on the basis of certain psychiatric and psychological evaluation reports that each court considered to have been admitted into evidence during the penalty phase, *i.e.*, the reports of Drs. A. James Giannini, Stanley J. Palumbo, and Nancy J. Huntsman. The panel and the court of appeals concluded that these reports essentially rebutted Dr. Eisenberg's conclusions relating to the R.C. 2929.04(B)(3) mitigating factor. However, the reports cited and relied upon by the panel and the court of appeals were not originally included in the record certified to this court by the Clerk of the Mahoning County Court of Appeals. Accordingly, this court made several attempts to obtain the reports and other information concerning them for purposes of our independent review of appellant's death sentence.[3] We have now received the

---

3. Portions of the record in this case were filed with the Clerk of the Supreme Court of Ohio on March 17, 1997. All parties were notified of the filing. Upon request of the Clerk of the Supreme Court of Ohio, the Mahoning County Clerk of Courts forwarded additional portions of the record. These additional portions of the record were filed with this court on October 2, 1997. Again, all parties were notified of the filing. Upon further inquiry by the Clerk of the Supreme Court of Ohio, specifically concerning the missing reports of Drs. A. James Giannini, Stanley Palumbo, and Nancy Huntsman, the Mahoning County Clerk of Courts issued the following notice which was filed in this court on October 24, 1997:

"*NOTICE*

"Notice is hereby given that the Mahoning County Clerk of Courts is now in possession of materials, relating to the above-referenced matter [*State v. Spivey*], recently given to [the clerk] by the Mahoning County Court Reporters. It appears that these items were not received by this office and, as such, are not time-stamped. Accordingly, these items were not transmitted as part of the Record on Appeal. However, this Notice is being filed to inform this Court and counsel of the existence of the Documents in the event that the items should have been filed with this office or in the event that their inclusion with the the [*sic*] Record on Appeal is needed. The items are set forth in the attached appendix. A copy of this notice is being sent to all counsel of record."

In the appendix to the notice, the Mahoning County Clerk of Courts listed, among other things:

"D. Manila folder marked 'Sentencing Hearing' (Aggravation Mitigation) containing:

"* * *

"3. Beige envelope dated December 5, 1989, marked 'Not Exhibits *Written Material*' containing:

"* * *

"b. September 29, 1989 Report of Dr. A. James Giannini

"* * *

"d. October 24, 1988 Psychological Evaluation prepared by Nancy Huntsman, Ph.D.

"e. September 22, 1989 Sanity Evaluation prepared by Stanley Palumbo, Ph.D."

The fact that the reports of Drs. Giannini, Palumbo, and Huntsman were absent from the record certified to this court by the Mahoning County Clerk of Courts, coupled with the assertions made in the above-quoted "notice," gave us pause to consider a number of important issues. Specifically, we began to question whether the subject reports were ever formally admitted into evidence for consideration by the three-judge panel that tried this case, whether the reports were ever actually received and reviewed by the court of appeals, and, ultimately, whether the reports should be included as part of the record for our review. With those questions in mind, we thoroughly reviewed the entire record that had been certified to us by the Mahoning County Clerk of Courts. However, we were unable to determine, with absolute certainty, whether the reports of Drs. Giannini, Palumbo, and Huntsman were ever formally admitted into evidence for consideration by the panel.

For instance, there was an indication in the transcript that the original trial judge (Judge Economus), who subsequently became one of the members of the three-judge panel, did review the report of Dr. Palumbo in September 1989, had it stamped as being filed, and then had the report locked in "the safe." There were also indications in the transcript that, among other things, Dr. Giannini's report and certain records and reports from the Forensic Center had been included in an exhibit that was apparently marked and introduced in the penalty phase as "Defendant's Cumulative Exhibit 1." That "cumulative" exhibit was admitted into evidence at the mitigation hearing and was referred to in the transcript as "Defendant's Exhibit No. 1." However, in the record before us, "Defendant's Exhibit 1" is composed of a stapled packet of materials that contains no such reports. To complicate matters further, there were indications in the transcript that the packet of materials before us that is marked "Defendant's Exhibit 1" was actually part of the "cumulative" defense exhibit. Additionally, the transcript was clear that the reports of Giannini, Palumbo, and Huntsman were used by the state to cross-examine defense expert Dr. James R. Eisenberg during the mitigation hearing. A further complicating factor was that both the opinion of the trial panel and that of the court of appeals clearly stated that the reports of Giannini, Palumbo, and Huntsman were "admitted" and, thus, reviewed. However, as previously noted, none of the reports was physically contained in the record certified to this court by the Mahoning County Clerk of Courts, and we were unable to determine whether the subject reports were actually admitted as part of the record.

Therefore, given all the questions and circumstances surrounding the subject reports, and believing that the reports were extremely relevant for purposes of our independent review of the appropriateness of appellant's death sentence, we issued the following entry on December 24, 1997:

"This cause is pending before the court as an appeal from the Court of Appeals for Mahoning County.

"In its December 1989 opinion, the trial court (three-judge panel) stated:

" 'In consideration whether or not the Defendant, at the time of committing the offense because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law, the court reviewed the admitted reports of Doctors Stanley J. Palumbo, A.J. Giannini and Nancy J. Huntsman. None of the examiners felt that the Defendant suffered from a borderline psychosis. All of them did agree that the Defendant has personality problems. However, the evidence is clear that his personality disorder is not the product of a mental illness or defect. For example, Dr. Giannini found that the Defendant's character disorder does not meet the criteria for a psychiatric organic mental defect. Dr. Palumbo stated that it is his opinion that the Defendant understood the nature and wrongfulness of his actions and that at the time of the event "there was no reason to believe that, in any way, was he [Defendant] unable to prevent his behavior from occurring because of any gross mental disorder." ' 

"Similarly, the court of appeals' opinion stated:

subject reports as well as the necessary information and briefing concerning them pursuant to our order of December 24, 1997. We are convinced that the information

---

" 'It was also admitted, at the mitigation hearing, reports of Dr. J. [*sic*] Stanley Palumbo, Dr. A.J. Giannini, and Nancy Huntsman. None of the examiners felt that the defendant suffered from a borderline psychosis. All of them did agree that the defendant had personality problems; however, it was their joint opinion that his personality disorder was not the product of a mental illness or defect. Dr. Palumbo stated that, in his opinion, the defendant understood the nature and wrongfulness of his actions and that, at the very time of the event, there was no reason to believe that in any way was the defendant unable to prevent his behavior from occurring because of any gross mental disorder.'

"This court has reviewed the entire record certified to us by the Clerk of the Mahoning County Court of Appeals and has been unable to locate the reports referenced by the trial court and the court of appeals. Accordingly, counsel for the state of Ohio and for appellant Warren Spivey are ordered to review the entire record in case No. 97-414 and:

"1. Locate, if they exist, the reports of Drs. A.J. Giannini, Stanley Palumbo and Nancy Huntsman which are referenced in the opinion of the trial court and the opinion of the court of appeals.

"2. Determine whether the reports, if any, are a part of the formal record of this case by way of having been admitted into evidence before the trial court (three-judge panel).

"3. File a memorandum, within thirty days of the date of this entry, pointing to a place or places in the record where the reports, if any, have been properly entered into the evidence.

"4. File with this court the actual reports, if any, and if admitted.

"5. If there are no such reports or if there are reports but they were not admitted into the evidence, then counsel should so state." (1997), 80 Ohio St.3d 1488, 687 N.E.2d 1387.

On January 21, 1998, the state of Ohio filed a memorandum in response to our December 24, 1997 entry. Attached to the memorandum were copies of the reports of Drs. Giannini, Palumbo, and Huntsman. A review of the state's memorandum and, more important, a review of the reports attached thereto convinces us that the subject reports were admitted into evidence during the penalty phase as part of "Defendant's Cumulative Exhibit 1." On January 21, the state also filed a motion to supplement the record with the reports of Drs. Giannini and Palumbo. Attached to the motion was an affidavit signed by the Chief Deputy of the Clerk of Courts for Mahoning County. In her affidavit, the Chief Deputy Clerk provided the following information concerning these reports:

"2. As a result of the judgment entry of [the Ohio Supreme Court] filed December 24, 1997, regarding specific reports submitted as evidence I conducted another search of the Mahoning County Courthouse.

"3. As a result of this search, it was discovered that the original reports of Drs. Palumbo and Giannini had been inadvertently forwarded to the microfilm department. This area was not previously searched since records are not to be forwarded to microfilm unless the case has been closed.

"4. As a result of this search, it was discovered that the report of Dr. Giannini had been filed September 29, 1989. The original of this report was located in the microfilm department. The original of this report is attached to this affidavit.

"5. The search also revealed that the original report of Dr. Palumbo was in the microfilm department; it had been filed with this Court on September 22, 1989. The original of this report is attached to this affidavit."

The state's motion to supplement the record is hereby granted.

received clearly establishes that the reports were admitted into evidence in the penalty phase as part of a cumulative defense exhibit and that they were properly considered by the panel and the court of appeals as part of the formal record in this case.

{¶ 66} The reports of Drs. Giannini and Palumbo (and perhaps even the report of Dr. Huntsman) are contrary to and/or inconsistent with Dr. Eisenberg's conclusion that appellant, because of a mental defect, lacked substantial capacity to conform his conduct to the requirements of the law at the time of the offenses. Dr. Huntsman, a psychologist, performed a psychological evaluation of appellant in October 1988 (prior to the killing) for purposes of determining his competency to stand trial in an unrelated criminal matter. At that time, Huntsman indicated that although appellant had an "Antisocial Personality Disorder," he had no mental disease or disorder that would render him incompetent to stand trial. Dr. Palumbo, a psychologist, examined appellant in September 1989 for purposes of his pleas of not guilty by reason of insanity. In his report, Palumbo concluded that, at the time of the murder, "Mr. Spivey understood the nature of his behavior and the wrongfulness of his actions, and there is no reason to believe that, in any way, was he unable to prevent his behavior from occurring because of any gross mental disorder." In the report, Palumbo also stated that "[a]t the time of the event, Mr. Spivey did not appear to be suffering from any gross mental disorder which would have affected his behavior." Dr. Giannini, a psychiatrist, also examined appellant in September 1989 for purposes of his pleas of not guilty by reason of insanity. In his report, Giannini stated:

"On the basis of my examination of Mr. Spivey, I find that he meets some criteria for a character disorder but does not qualify for a diagnosis in this category. He does not meet criteria for a thought or mood disorder or an organic mental defect. * * * In conclusion, therefore, it is my opinion that Mr. Spivey does not now or did in the recent past suffer from any psychiatric defect. * * * In my opinion,

he is competent to stand trial and participate meaningfully in his own defense. He does not suffer from any psychiatric condition which would impair his ability to distinguish right from wrong, impair his ability to understand the consequences of his actions or impair his ability to refrain from such activity."

{¶ 67} Having reviewed the conclusions of all of the experts, and considering the entirety of Dr. Eisenberg's testimony concerning the R.C. 2929.04(B)(3) factor and appellant's capacity to control his behavior, we find that appellant did not demonstrate the existence of the R.C. 2929.04(B)(3) mitigating factor by a preponderance of the evidence. We reach this conclusion for a number of reasons. First, the reports of Drs. Giannini and Palumbo clearly indicate that appellant had no psychiatric or psychological disorder, defect, or condition that would have in any way impaired appellant's ability to control his behavior at the time of the murder. Second, despite Dr. Eisenberg's testimony on direct examination, Eisenberg did acknowledge, on cross-examination, that it was *not* his testimony that appellant lacked the ability to control his behavior at the time of the killing. Third, we find no credible evidence in the record indicating that appellant acted impulsively and, thus, uncontrollably at the time of the murder. However, even though appellant did not demonstrate the existence of the R.C. 2929.04(B)(3) factor by a preponderance of the evidence, we do find that appellant's various psychological problems, as testified to by Dr. Eisenberg and as reflected elsewhere in appellant's records, are entitled to some weight in mitigation as R.C. 2929.04(B)(7) "other" mitigating factors.

{¶ 68} Weighing the aggravating circumstance appellant was found guilty of committing against the evidence presented in mitigation, we find that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

{¶ 69} Finally, we have undertaken a comparison of the sentence imposed in this case with those in which we have previously affirmed the death penalty. We

find that appellant's death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases.

{¶ 70} Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

_____

APPENDIX

"*Proposition of Law 1[:]* U.S. CONST. amend. VI and XIV and OHIO CONST. art. I, §§ 10 and XVI guarantee a criminal defendant a fair and impartial jury. A trial court must determine that any waiver of such right is knowingly, intelligently, and voluntarily made.

"*Proposition of Law 2[:]* The ineffective assistance of counsel provided to Defendant-Appellant violated his rights to a fair and impartial jury trial and sentence, as guaranteed by the U.S. CONST., amend. V, VI, VIII, and XIV and by OHIO CONST., art. I, §§ 5, 9, 10, and 16.

"*Proposition of Law 3[:]* A criminal defendant is deprived of due process of law, U.S. CONST. amend. XIV, a remedy in the courts by due process of law, and the administration of justice without denial, OHIO CONST. art. I, § 16 when a trial court accepts a plea of guilty or no contest without a sufficient inquiry into the defendant's competence to waive his constitutional rights.

"*Proposition of Law 4[:]* Due process of law, U.S. CONST. amend. XIV, and the administration of justice without denial and a remedy by due course of law, OHIO CONST. Art. I, § 16, demand that withdrawal of a plea of guilty or no contest before sentence must be freely granted.

"*Proposition of Law 5[:]* Ohio's death penalty law, OHIO REV. CODE ANN. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and

2929.05, violate U.S. CONST. amend. V, VI, VIII, and XIV and the immunities specified in OHIO CONST., art. I, §§ 1, 2, 5, 9, 10, and 16.

"*Sub-Proposition of Law No. 5(A)[:]* Ohio's death penalty law violates U.S. CONST. amend. VIII and XIV and OHIO CONST. art. I, §§ 1, 2, 9, 10, and 16 because the effective appellate review required by those constitutional provisions is lacking.

"*Sub-Proposition of Law No. 5(B)[:]* Death by Electrocution and Lethal Injection Violate U.S. CONST. amend. VIII and XIV and OHIO CONST., art. I, § 9.

"*Sub-Proposition of Law No. 5(C)[:]* Ohio's death penalty law violates the guarantees of due process of law, equal protection of the law, and cruel and unusual punishment specified in U.S. CONST. amend. VIII and XIV and OHIO CONST. art. I, §§ 2, 9, and 16.

"*Sub-Proposition of Law No. 5(D)[:]* Because Ohio's death penalty is fraught with discrimination, it violates U.S. CONST. amend. VIII and XIV and OHIO CONST. art. I, §§ 2, 9, and 16.

"*Sub-Proposition of Law No. 5(E)[:]* The unbridled charging discretion given the government results in Ohio's death penalty being in violation of U.S. CONST. amend. VIII and XIV and OHIO CONST. art. I, §§ 2, 9, and 16.

"*Sub-Proposition of Law No. 5(F)[:]* Ohio's death penalty violates the Ohio Constitution; OHIO CONST. art. I, §§ 1, 2, 5, 9, 10 and 16.

"*Sub-Proposition of Law No. 5(G)[:]* Ohio's death penalty law violates the constitutional guarantees of the effective assistance of trial counsel and trial before an impartial jury, U.S. CONST. amend. VI and XIV and OHIO CONST. art. I, §§ 5 and 10.

"*Sub-Proposition of Law No. 5(H)[:]* The Ohio death penalty violates U.S. CONST. amend. VI and XIV and OHIO CONST. art. I, §§ 2, 5, 10, and 16 because the statutes permit denial of impartial jury.

"*Sub-Proposition of Law No. 5(I)[:]* The Ohio death penalty fails to provide adequate guidelines for deliberation and therefore violates U.S. CONST., amend. VIII and XIV and OHIO CONST., art. I, § 9.

"*Sub-Proposition of Law No. 5(J)[:]* The Ohio death penalty law violates the Rights to a Jury Trial and to be Free from Self-incrimination; U.S. CONST., amend. V, VI, and XIV and OHIO CONST., art. I, §§ 1, 5, 10, and 16.

"*Sub-Proposition of Law No. 5(K)[:]* The Ohio death penalty law fails to provide a meaningful proportionality review and therefore violates U.S. CONST., amend. VIII and XIV and OHIO CONST., art. I, § 9.

"*Sub-Proposition of Law No. 5(L)[:]* The Ohio death penalty law fails to provide Adequate Appellate Analysis and accordingly violates U.S. CONST., amend. VIII and XIV and OHIO CONST., art. I, § 9.

"*Sub-Proposition of Law No. 5(M)[:]* The requirement that death be imposed in certain circumstances violates U.S. CONST., amend. VIII and XIV and OHIO CONST., art. I, § 9.

"*Sub-Proposition of Law No. 5(N)[:]* The Ohio law fails failure [*sic*] to require trial courts to make a decision about appropriateness, and therefore violates U.S. CONST., amend. VIII and XIV and OHIO CONST., art. I, § 9.

"*Proposition of Law No. 6[:]* Ohio's mandatory sentencing scheme prevented the panel of three judges from deciding whether death was the appropriate punishment in violation of Appellant's rights as guaranteed by U.S. CONST., amend. VIII and XIV and OHIO CONST., art. I, §§ 9 and 16.

"*Proposition of Law No. 7[:]* Failure of the Ohio Supreme Court to consider errors not raised in the Court of Appeals is a denial of the access to the courts required by OHIO CONST. art. I, §§ 1 and 16.

"*Proposition of Law No. 8[:]* The proportionality review that this Court must conduct in the present capital case pursuant to OHIO REV.CODE ANN. § 2929.05 is fatally flawed and therefore the present death sentence must be vacated

pursuant to the U.S. CONST. amend. V, VIII, and XIV; OHIO CONST. art. I, §§ 5, and 10; and OHIO REV.CODE ANN. § 2929.05.

"*Proposition of Law No. 9[:]*  The three judge panel may not base its decision on non-statutory aggravating factors.  To do so is violative of OHIO REV.CODE ANN. § 2929.04.

"*Proposition of Law No. 10[:]*  When the State violates the OHIO CRIM.R. 11 plea agreement, the court must permit the opportunity for the withdrawal of the plea."