[Cite as *State v. Shanklin*, 2019-Ohio-1732.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. John W. Wise, J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2018 CA 00069 |
| RONALD RONDELL SHANKLIN | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |

CHARACTER OF PROCEEDING:        Criminal appeal from the Stark County
Court of Common Pleas, Case No.
2017CR2169

JUDGMENT:        Affirmed

DATE OF JUDGMENT ENTRY:        May 6, 2019

APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

JOHN FERRERO                         ANTHONY KOUKOUTAS
Stark County Prosecutor               116 Cleveland Avenue N.W
BY: KRISTINE BEARD                   808 Courtyard Centre
Assistant Prosecutor                   Canton, OH 44702
110 Central Plaza South, Ste. 510
Canton, OH 44702-1413

*Gwin, P.J.*

{¶1}    Appellant Ronald Rondell Shanklin ["Shanklin"] appeals his convictions and sentences after a jury trial in the Stark County Court of Common Pleas.

*Facts and Procedural History*

{¶2}    In May 2000, in the Illinois Circuit Court, Shanklin, a Chicago resident, pled guilty to one count of attempted murder and was sentenced to serve 19 years in an Illinois prison.  In October 2016, Shanklin was released on parole under the supervision of the Illinois Department of Corrections, Parole Division.  As a condition of his release, Shanklin was required to register a cell phone number and use an assigned PIN number to periodically check in with the Illinois Department of Probation's AMS (Automated Messaging Service) system.  Upon his release, Shanklin registered, with the AMS system using the T-Mobile cell phone number 314-885-0882 (0882).  Shanklin used the 0882 cell phone number to repeatedly check in with the system from January 10, 2017 to June 20, 2017.

{¶3}    In the fall of 2016, Ivan Munford was released from an Ohio prison after serving time for marijuana possession.  After Munford's release, Shanklin's cousin, Allen Walker ["Walker"], aka "Smoke," loaned Munford nine thousand dollars ($9,000.00).  In May 2017, approximately two thousand dollars ($2,000.00) of the loan remained unpaid. In May 2017, during a telephone conversation, Munford and Walker got into an intense argument over the unpaid loan balance.  After the argument, Munford became concerned for his life even attempting to purchase a gun for protection.  As a result, Munford had no further contact with Allen Walker or Walker's cousin, Tullis White ["White"].

{¶4} On June 21, 2017, Munford and others including White, White's friend Calvin Carroll ["Carroll"], and Munford's fiancé, Rachel Sisson ["Sisson"], went fishing at Atwood Lake. Sisson thought this seemed unusual since Munford and White had not been speaking since Munford's argument with Walker. At the end of the day, Munford and Sisson went home. Munford took a shower and got ready to go out with his friends, Courtney Burns ["Burns"] and Anthony Brewton ["Brewton"].

{¶5} Munford arrived at Burns' house around 10:00 P.M. Burns arrived home ten minutes later, followed by Brewton. Around 12:05 A.M. White and Carroll arrived. White went inside Burn's home to purchase marijuana from Munford and Carroll remained in a vehicle parked in an alley behind the house.

{¶6} At trial, White testified that he saw Brewton at the kitchen counter, charging his cell phone. By White's testimony, White and Carroll left Burns' home at approximately 12:15 A.M. White testified that he had planned to meet Burns, Munford and Brewton at a bar later that evening. While White was buying marijuana, an unidentified black male arrived, dropped off cigarettes and left. Although White did not know the person's name, he recognized him from the southwest end of Canton and informed the police that the person was a "crackhead." Per White's testimony, Brewton was wearing a red shirt.

{¶7} After White and Carroll left, Munford, Burns and Brewton got ready to go to the bar. Burns agreed to drive, went out the back door to get his truck, and waited in the alley for Munford and Brewton. Brewton stayed in the kitchen continuing to charge his cell phone. Munford went out the front door to get something from his truck. Shortly after Munford went out the front door, Brewton heard gunshots. Brewton looked out the window, and saw Munford on the sidewalk, at the bottom of the hill, in front of the Burns'

house. Brewton quickly exited the house, ran to Munford's side, and saw blood everywhere. Brewton testified that he told Munford to hold on, and called 9-1-1 for help. At that time, Brewton stated that Burns ran from the back to the front of the house.

{¶8} During the first attempted 9-1-1 call, Brewton's partially charged cell phone died. A portion of what Brewton said was recorded. Meanwhile, Burns came around the front of the house to see what was happening. Burns testified that when he saw Brewton's distress, and Munford's lifeless body, he realized Munford had been shot. In the first 9-1-1 recording Brewton can be heard saying, "Get the hammer (gun) and get to Bruh" (meaning Munford). Brewton testified that he was concerned that the shooter might still be in the area, and told Burns to get a gun from the house for protection. Brewton then used Burns' cell phone to make a second 9-1-1 call for help. When Burns returned with the gun, Burns turned Munford on his side to prevent Munford from chocking on his own blood. Brewton claimed that he did not know whose gun he had retrieved. Although Brewton was close to the front door, he claimed that he did not hear any arguing or commotion outside prior to the sound of gunshots. The police did not take clothing from Brewton or test him for gunshot residue. The police did take Brewton's phone, but returned it that night. According to Brewton, he did not see who shot Munford, nor does he know Ronald Shanklin.

{¶9} According to Burns' testimony, he was standing in the alley by his truck waiting for the others when he suddenly heard gunshots ring out in front of his house, causing him to run into his neighbor's backyard, away from the gunshots. After the gunfire ceased, Burn's walked toward Garfield Avenue where he happened upon Munford, lying on the ground with blood coming out of his mouth. Burns turned Munford over on his side

so he would not choke on his own blood. According to Burns, he did not see anyone else near Munford until a few moments later when Brewton appeared. Burns stated that Brewton told him to go get a gun, but he does not remember if he or anyone else went to get a gun.

{¶10} Burns then decided that it was taking too long for help to arrive. Burns ran to get his truck to transport Munford to the hospital. As Burns was driving his truck to the front of the house, he saw police and paramedics coming down the street. Burns flagged the first responders to the location of Munford's body, and pulled into a nearby Laundromat parking lot to clear the way for police vehicles. After the police arrived, unbeknown to law enforcement, Brewton put the gun back in the house. Burns went downtown and submitted to a recorded interview. Contrary to his testimony, Burns told the police in his recorded statement that both Munford and Brewton went out the front door of the house and that Munford locked the front door. Also contrary to his testimony, Burns told the police that as he ran toward Munford, he saw Brewton running back into the house. Burns also told the police that White and Brewton were not at his home at the same time, contradicting his own as well as Brewton's testimony.

{¶11} Sergeant Pelligrino, from the Canton Police Department, responded to the scene. Sergeant Pelligrino testified that he observed Munford's body lying on its side facing the bottom of the hill. He testified he saw grass marks that indicated someone had rolled down the hill. Pelligrino also observed a fatal bullet wound to the right side of Munford's head. Finally, Sergeant Pelligrino observed a cell phone, a bottle of men's cologne and Munford's truck keys laying in the grass, in the front of the house, at the top of the hill.

{¶12} The police asked Burns to sign a consent form allowing officers to search his house. Burns initially refused, but after Detective Talkington and Sergeant George told him that if there was dope or a gun in his home they were not interested unless it was a gun involved in this case, Burns changed his mind. When the detectives found a gun, they complied with the terms of the deal. Despite the fact that Burns is a convicted felon and cannot legally possess a firearm, no charges were filed. Burns claimed he did not fire a gun that night and did not shoot Munford. According to Burns, he did not see who shot Munford, nor does he know Ronald Shanklin.

{¶13} On June 22, 2017, at around 4:05 A.M., Agent Daniel Boerner a special agent for Ohio's BCI arrived at the murder scene. Agent Boerner collected several items from the sidewalk at the scene including, two black socks from the sidewalk. One sock was covered in grass. He additionally collected seven 9 mm R&P shell casings, and a bullet fragment. Agent Boerner also collected a pair of black sandals from the entrance to Eric Thomsen's house, which was located directly across the street from the murder scene.

{¶14} On June 22, 2017, at 2:30 P.M., Deputy Jack Hewitt from the Stark County Sheriff's Department was dispatched to a call regarding a gun laying on the side of the road near the intersection of Whipple and Everhard Roads in North Canton, off I-77. Deputy Hewitt recovered the gun and identified the gun as being a Sig Sauer. A search of the gun's serial number revealed that it was stolen property. Deputy Hewitt observed that the magazine was missing. He also observed a white strip of paint on the gun. He testified that the paint strip matched the off-white paint on the I-77 overpass directly above the location of the gun. At trial, Deputy Hewitt testified that it appeared that the gun had

been thrown from a car traveling on I-77, struck the bridge and then landed where it was located.

{¶15} On June 22, 2017, in the early morning hours after the murder, Sergeant Victor George of the Canton Police Department and Detective Talkington interviewed several witness including, Eric Thomsen, Anthony Brewton and Courtney Burns.

{¶16} Eric Thomsen ["Thomsen"] lives across the street from Courtney Burns in an upstairs apartment with a balcony facing Burns' front lawn. Thomsen testified that around 9:00 P.M., he arrived home with his 2-year-old son. Around midnight Thomsen went onto his balcony to clean up his son's toys and heard people across the street talking. He looked and saw two shadows. He then heard a loud bang, and saw a flash. Thomsen testified that he heard a total of five or six gunshots. After hearing the gunshots, Thomsen crawled back into his house, checked on his small son and called 9-1-1. When Thomsen returned to the window, he saw two people trying to help Munford. Thomsen also saw one person run to the back of the house and get a truck. After the police arrived, Thomsen walked out his side door and found a pair of sandals. Thomsen testified that the sandals were foreign to the area and were perfectly placed right next to each other. He told officers that he was the only person who used the side door on the night of the murder and that the sandals were not there when he arrived home at 9 P.M.

{¶17} The investigating officers also spoke to Courtney Burns who admitted that he and Brewton possessed a gun on the night of the murder. Detectives George and Volpe went back to the residence to search Burns' home and recover the gun. With Burns' consent, they searched the house and collected the firearm. There was no evidence presented that connected this firearm to the murder.

{¶18} Dr. Frank Miller, the Deputy Coroner from the Stark County Coroner's Office, performed Munford's autopsy. Items collected from Munford's body included, his clothing, $2,791.13 of United States currency, and a baggy containing a green leafy substance. At trial, Dr. Miller reviewed autopsy photos and testified that the photos of Munford's shirt depicted that the shirt was covered in soot. He told the jurors that soot is burned gun powder or smoke that emanates from a gun and deposits on the first thing it runs into. He further testified that generally this type of soot is deposited when a gun is shot between 6 to 12 inches from an object.

{¶19} Dr. Miller further testified that Munford had sustained multiple gunshot wounds. Dr. Miller collected a bullet from a gunshot that entered the middle of Munford's back, went into his chest, through his left lung and lodged in his spine. Dr. Miller also collected a bullet lodged in Munford's left elbow. Dr. Miller testified that the fatal gunshot wound was to Munford's head. This shot hit Munford's temporal lobe and brain, causing immediate unconsciousness, and death. Dr. Miller testified that this injury would cause a person to immediately lose voluntary muscle control, fall to the ground, and remain immobile. Dr. Miller also found that Munford had defensive wounds on his hands, arms and forearms.

{¶20} In July 2017, Detective Talkington spoke with Rachel Sisson, and learned about the argument between Walker and Munford. As a result, Talkington developed Walker as a person of interest. Detective Talkington also received additional tips, which caused him to begin investigating Allen Walker as a suspect in Munford's murder. The investigation revealed that Walker was from Chicago; Walker has a daughter named Unique Walker; and, that Unique Walker's mother is Ronald Shanklin's sister.

{¶21} In October or November 2017, Deputy Craig Kennedy from the Stark County Sheriff's Department contacted Talkington to advise him that Allen Walker was a victim in an October 2017 shooting and that a cell phone with the primary number being 330-705-9876 had been confiscated at the scene. Kennedy thought the two shootings might be related. Talkington discovered that cell phone number 330-705-9876 was associated with Allen Walker. Walker could never be found for questioning.

{¶22} Detective Talkington testified that he forward the evidence collected from both the scene and Munford's body during the autopsy to BCI for forensic analysis. BCI forensic scientist, Michael Roberts, received and analyzed the seven 9mm R&P shell casings, the bullets recovered from Munford's body, and the Sig Sauer firearm recovered by Deputy Hewitt. Roberts examined each shell cartridge using a comparison microscope and test fired the Sig Sauer. Roberts determined, conclusively, and to the exclusion of all other firearms, that the seven shell casings recovered from the murder scene had been fired from the Sig Sauer. Roberts also determined, that the bullets recovered during the autopsy had been fired by the Sig Sauer.

{¶23} BCI forensic scientist, Andrea Dennis, received and performed DNA analysis on the seven shell casings, two black socks, and the pair of black sandals. Dennis determined that the shell casings contained no valuable data for DNA purposes. She also found that a swab from inside the first black sock was not suitable for DNA comparison. Dennis determined that the sandals, collected from the house across the street from the murder, had a mixture of two major contributors. She ran the DNA from the sandals in CODIS, (a DNA database maintained by the FBI), and found a match to Ronald Shanklin. She then requested that a DNA standard be collected from Shanklin.

Detective Randy Weirich from the Canton Police Department collected a DNA standard from Shanklin to be used for further analysis. Dennis did a subsequent comparison between the sandals' DNA sample and Shanklin's DNA standard and found that Shanklin was a match. In fact this DNA match occurred in one out of seven billion possible contributors. Dennis also performed comparisons on a swab taken from the second black sock and found that there was DNA consistent with Shanklin within one and one trillion possible contributors. She testified that because of their prior criminal histories, the DNA profiles of both Burns and Brewton were likely in the CODIS system. Burns DNA was not found on any of the evidence collected from the scene and Brewton's DNA was found in a mixture of DNA from a cigar collected from the grass.

{¶24} Knowing Shanklin's identity, Detective Talkington discovered that Shanklin was on parole in Illinois. As a result, Detective Weirich contacted Commander Hart, at the Illinois Department of Corrections. Commander Hart advised Weirich that 314-885-0882 was the cell phone number Shanklin used to check in with the Parole Department's AMS system. Investigators then used a web site called phone finder to figure out T-Mobile was the service provider for Shanklin and that Walker's cell phone provider was Verizon Wireless.

{¶25} Joseph Sierra, a T-Mobile employee was ordered to provide investigators with the cell phone service records for cell phone number 314-885-0882, from June 15, 2017 to June 30, 2017. The records established that the subscriber for cell phone number, 314-885-0882, was Ronald Shanklin from Illinois. The records also included calls being made at or near the time of the murder to cell phone number 330-705-9876 (Walker's cell phone). The records further established that Shanklin's cell phone account

was cancelled on June 23, 2017, the day after the murder.  At trial, Sierra testified that cell phones typically pick the strongest tower for connection and that cell phones in Canton, Ohio, typically tune into a cell tower within 2.5 miles of a cellular device.

{¶26}  Fred Powell, a Verizon Wireless employee was ordered to provide cell phone records from June 12, 2017 to June 30, 2017, for cell phone number 330-705-9876 (Walker's cell phone).  The records included call detail records, cell site information and identified Allen Walker as the subscriber for the cell phone number.  (State's Exhibits 3 and 3.1.)

{¶27}  Special Agent Jacob Kunkle from the FBI performed a cellular analysis for both Shanklin's cell phone number (0882) and Walker's cell phone number (9876).  Special Agent Kunkle is a member of CAST (the Cellular Analysis Survey Team) which specializes in historical call detail analysis.  At trial, Kunkle described this as a fancy term for understanding phone companies' records, where cell phones are located, and, when cell phones make or receive calls.

{¶28}  Special Agent Kunkle was asked to analyze Shanklin and Walker's cell phone records at or near the time of Munford's murder.  As part of the analysis, Kunkle plotted all the Verizon and T-Mobile cell phone towers in the vicinity of the murder.  Kunkle's analysis established that within two days prior to the murder, on June 19, 2017 from 3:49 P.M., until June 20, 2017 at 3:45 AM., Shanklin's cell phone (0882) traveled south from Springfield, Illinois to North Canton, Ohio.  Upon arrival in North Canton, Shanklin's cell phone used a cell phone tower in the vicinity of Motel 6 off I-77 in the Belden Village area.

{¶29} Kunkle's analysis further established that on June 21, 2017, from 11:56 P.M. to 12:17 A.M., (at or near the time of the murder) Shanklin's cell phone was within 2.5 miles of the murder scene. The records further established that at 12:14 and 12:17 Shanklin and Walker exchanged cell phone calls. Walker's cell phone was identified as being in the vicinity of Meyers Lake at the time of the calls.

{¶30} On June 22, 2017, less than nine hours after the murder, at 8:30 A.M. Shanklin's cell phone left the vicinity of Motel 6 and traveled North, down I-77, back to Springfield, Illinois. The phone's northbound travel included the area where the Sig Sauer, was located by Deputy Hewitt on the day of the murder. On June 23, 2017, the day after the murder, Shanklin's terminated the 0882 cell phone account.

{¶31} Shanklin was subsequently arrested in Illinois on a Canton, Ohio warrant for the murder of Munford. Detective Talkington drove to Illinois to retrieve Shanklin for prosecution in Ohio. During the drive, Talkington and Shanklin spoke and Talkington became familiar with Shanklin's voice. On November 10, 2017, Shanklin engaged in several jail phone calls. At trial, Talkington identified Shanklin's voice in jail calls. (State's Exhibit 37). In one of the jail calls, Shanklin identifies himself as Rondell (i.e. his middle name). During the call Shanklin insinuated that he believed "Smoke" (i.e. Allen Walker) had turned the police onto him. A CD of the jail calls was played for and considered by the jury. (State's Exhibit 37).

{¶32} During plea negotiations, the state offered to recommend "flat time" if Shanklin would be willing to give a truthful proffer with the alleged role other individuals involved in the case. Shanklin rejected the offer. Shanklin was from Illinois but was related to, and familiar with, Walker and White. Additionally, Burns and Brewton,

Munford's friends present at the time of the murder, each testified that they did not see Munford being shot, did not know Shanklin and, that, even if they had seen Shanklin on the night of the murder, they would not have been able to identify Shanklin.

{¶33} Shanklin was indicted by the Stark County Grand Jury on one count of felony murder and one count of felonious assault each with repeat violent offender and firearm specifications, and one count of tampering with evidence. The case proceeded to jury trial. After the State's case, the court granted Shanklin's motion for acquittal on the one count of tampering with evidence. The matter proceeded to deliberations during which the jury found Shanklin guilty of the remaining charges.

{¶34} Evidence to support the Repeat Violent Offender specification came from the testimony of Detective Victor George of the Canton Police Department. Detective George presented the court with a document filed on June 26, 2000, establishing that Shanklin had a prior conviction for Attempted Murder in the McClean County Circuit Court of the Eleventh Judicial Circuit, Illinois, Case No. 00CR28. George further testified that the photos and DNA from the Illinois conviction matched Shanklin. Base on the evidence presented, the court found Shanklin guilty of the Repeat Violent Offender specifications.

{¶35} For sentencing purposes, the trial court merged the murder and felonious assault convictions. Thereafter, Shanklin was sentenced to serve 15 years to life for the murder conviction, a mandatory 3 years for the firearm specification, and a definite 10 years for the repeat violent offender specification for an aggregate term of imprisonment of 28 years to life.

*Assignments of Error*

{¶36}  Shanklin raises three Assignment of Error,

{¶37}  "I.  THE COURT ERRED BY NOT GRANTING MR. SHANKLIN'S MOTION TO DISMISS DUE TO THE STATE'S PROSECUTORIAL MISCONDUCT BY FAILING TO PROVIDE DISCOVERY IN A TIMELY MANNER.

{¶38}  "II. APPELLANT'S CONVICTIONS WERE AGAINST THE SUFFICIENCY AND MANIFEST WEIGHT OF THE EVIDENCE.

{¶39}  "III. APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL DUE TO COUNSEL'S FAILURE TO ADDRESS HIS MENTAL HEALTH/ COMPETENCY ISSUES."

I.

{¶40}  In his First Assignment of Error, Shanklin argues that the trial court erred by overruling his motion to dismiss based upon the state's discovery violations.  Specifically, Shanklin contends, "Mr. Shanklin filed a Motion to Dismiss on March 30, 2018, based on the State's numerous discovery violations pursuant to Crim.R. 16. (Appendix, hereinafter, "App." F). The underlying theme is that the State provided the discovery piecemeal to the defense and the defense was concerned that they were not getting all of the evidence." (Appellant's Brief at 15).

**STANDARD OF APPELLATE REVIEW.**

{¶41}  Crim.R. 16(E)(3) vests in the trial court the discretion to determine the appropriate response for failure of a party to disclose material subject to a valid discovery request.  In *State v. Parson*, 6 Ohio St.3d 442, 445, 6 OBR 485, 487, 453 N.E.2d 689, 691(1983), the Court observed that, under such circumstances, "the trial court is vested

with a certain amount of discretion in determining the sanction to be imposed for a party's nondisclosure of discoverable material. The court is not bound to exclude such material at trial although it may do so at its option." Reversible error exists only where the exercise of such authority by the trial court constitutes an abuse of discretion. *Parson*, at 445, 453 N.E.2d 689; *State v. Apanovitch*, 33 Ohio St.3d 19, 26, 514 N.E.2d 394, 402(1987).

{¶42} In *Parson,* a tripartite test was set forth to determine whether a trial court abused its discretion in admitting undisclosed discoverable evidence. The syllabus to *Parson* provides as follows:

> Where, in a criminal trial, the prosecution fails to comply with Crim.R. 16(B)(1)(a)(ii) by informing the accused of an oral statement made by a co-defendant to a law enforcement officer, and the record does not demonstrate (1) that the prosecution's failure to disclose was a willful violation of Crim.R. 16, (2) that foreknowledge of the statement would have benefited the accused in the preparation of his defense, or (3) that the accused was prejudiced by admission of the statement, the trial court does not abuse its discretion under Crim.R. 16(E)(3) by permitting such evidence to be admitted. *See, also, State v. Heinish* (1990), 50 Ohio St.3d 231, 553 N.E.2d 1026.

*See also, State v. Wiles,* 59 Ohio St.3d 71, 79, 571 N.E.2d 97(1991). The same tripartite test applies for determining whether a trial court has abused its discretion in admitting other evidence that was not properly disclosed under Crim.R. 16. *State v. Scudder,* 71 Ohio St.3d 263, 269, 21994-Ohio-298, 643 N.E.2d 524(1994).

**{¶43}** An abuse of discretion can be found where the reasons given by the court for its action are clearly untenable, legally incorrect, or amount to a denial of justice, or where the judgment reaches an end or purpose not justified by reason and the evidence. *Tennant v. Gallick*, 9th Dist. Summit No. 26827, 2014-Ohio-477, ¶35; *In re Guardianship of S.H.,* 9th Dist. Medina No. 13CA0066–M, 2013–Ohio–4380, ¶ 9; *State v. Firouzmandi*, 5th Dist. Licking No.2006–CA–41, 2006–Ohio–5823, ¶54.

### ISSUE FOR APPEAL

*Whether the trial court abused its discretion by overruling Shanklin's motion to dismiss.*

**{¶44}** As the state correctly notes, the trial court never ruled on Shanklin's motion. When a trial court fails to rule upon a motion, it is presumed the trial court overruled such motion. *State ex rel. The V Companies v. Marshall*, 81 Ohio St.3d 467, 469, 692 N.E.2d 198(1998); *Newman v. Al Castrucci Ford Sales, Inc.*, 54 Ohio App.3d 166, 561 N.E.2d 1001(1988), par. 4 of the syllabus; *State v. Pincheck,* 5th Dist. Tuscarawas No. 97AP090058, 1999 WL 174925 (Mar. 18, 1999). In light of this presumption, we find Shanklin's motion was overruled by the trial court.

**{¶45}** In his Motion to Dismiss filed in the trial court on March 30, 2018, Shanklin alleged that trial was scheduled to begin on April 4, 2018. He further noted that the state had provided additional discovery on: March 19, 2018 of the 9-1-1 recordings made on June 22, 2017; on March 20, 2018 two CD's of video evidence collected in June 2017; on March 27, 2018 a CD of coroner photos and a CD of the video interviews of Tullis White, Ronald Shanklin, Norman Randolph, Eric Thomsen, Courtney Burns and Anthony Brewton [*See*, Docket No. 64]; on March 28, 2018 the BCI lab reports concerning the Sig

Sauer [*See*, Docket Number 65]; and on March 30, 2018 jail call records. [*See*, Docket No. 66]. See, *Motion to Dismiss,* filed March 30, 2018 [Docket Number 68].

**{¶46}** The state provides no explanation for the delay in providing this evidence to the defense, in some cases less than one week before trial, when at least some of the evidence had been collected at or near the time of the crime in June 2017.

**{¶47}** Nothing in the record affirmatively shows that the discovery violations here were willful, as opposed to unintentional. It does not appear from the record before us, and Shanklin does not elucidate how foreknowledge of any of the evidence would have benefited his defense. It does not appear, and Shanklin does not specifically argue any prejudice ensuing from the late disclosure. In *State v. Darmond,* the Ohio Supreme Court noted,

> Although we are not mandating a specific procedural course of conduct in this case, we note that rather than dismissing the case with prejudice, the trial court could have continued the case to allow further inquiry into the details regarding the other packages. *See Lakewood*, 32 Ohio St.3d at 5, 511 N.E.2d 1138 (a continuance should be ordered if it is feasible and would allow for an opportunity to minimize any surprise or prejudice caused by the discovery violation). This was a bench trial, and the defendants were out on bond. Clearly, a continuance to clear up the facts of the discovery violation would have been a feasible alternative.

135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶40.

**{¶48}** Although this was a jury trial and Shanklin was incarcerated at the time, a short continuance to allow the defense time to review the discovery would not have been

unreasonable; however, Shanklin never requested a continuance. "Instead he asked for the most stringent option—total exclusion of the testimony. In the absence of a motion for a continuance, "* * * the trial court properly concluded that defense counsel was prepared to go forward at that time. * * *" *Edwards, supra*, 49 Ohio St.2d at 43, 3 O.O.3d at 24–25, 358 N.E.2d at 1060." *State v. Finnerty,* 45 Ohio St.3d 104, 108, 543 N.E.2d 1233(1989).

**{¶49}** Contrary to Shanklin's contentions, we find that the trial court did not abuse its discretion in overruling his motion to dismiss.

**{¶50}** Accordingly, Shanklin's First Assignment of Error is overruled.

II.

**{¶51}** In his second assignment of error, Shanklin argues that there was insufficient evidence to convict him of murder. Shanklin further contends that the jury's findings are against the manifest weight of the evidence.

**STANDARD OF APPELLATE REVIEW.**

*1). Sufficiency of the Evidence.*

**{¶52}** The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." This right, in conjunction with the Due Process Clause, requires that each of the material elements of a crime be proved to a jury beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. __, 133 S.Ct. 2151, 2156, 186 L.Ed.2d 314 (2013); *Hurst v. Florida*, 136 S.Ct. 616, 621, 193 L.Ed.2d 504 (2016). The test for the sufficiency of the evidence involves a question of law for resolution by the appellate court. *State v. Walker,* 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶30. "This naturally entails a review of the elements

of the charged offense and a review of the state's evidence." *State v. Richardson,* 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶13.

{¶53} When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus: *Walker,* at ¶30. "The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. *State v. Poutney,* 153 Ohio St.3d 474, 2018-Ohio-22, 97 N.E.3d 478, ¶19. Thus, "on review for evidentiary sufficiency we do not second-guess the jury's credibility determinations; rather, we ask whether, '*if believed*, [the evidence] would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001), *quoting Jenks* at paragraph two of the syllabus (emphasis added); *Walker* at ¶31. We will not "disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.'" *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 94, *quoting State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997); *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶74.

### ISSUE FOR APPEAL

*a. Whether, after viewing the evidence in the light most favorable to the prosecution, the evidence, "if believed, would convince the average mind of the defendant's guilt on each element of the crimes beyond a reasonable doubt."*

{¶54} There is no dispute in the case at bar that Ivan Munford was shot to death as alleged in the indictment. Shanklin's main argument is that there was insufficient evidence to identify him as the perpetrator of the crimes.

{¶55} As we have noted the evidence presented during trial established White drove to Burns' house and purchased marijuana from Munford. White left the house at approximately 12:15 A.M. Shortly after White left, Munford walked out of the front of the house, got cologne and other belongings from his truck. When he went back up the hill to meet Burns he was shot multiple times with a Sig Sauger firearm. The shots were fired within a distance of 6-12 inches. The coroner testified that the fatal head wound would result in immediate unconsciousness and loss of mobility. Munford's cell phone, truck keys and cologne were found at the top of the hill in the grass in front of the house. The tracks in the grass indicate that after Munford was shot, he dropped and rolled down the hill and onto the sidewalk.

{¶56} Shanklin, a felon on parole in Illinois for attempted murder, traveled south from Springfield, Illinois to an area near Motel 6 in North Canton off I-77. At the time of the murder, Shanklin's cell phone was near the cell phone tower closest to the murder scene (i.e. within 2.5 miles) and there were at least two phone calls between Walker and Shanklin at or near the time of the murder. One call occurred at 11:56 P.M. and the other occurred at 12:17 P.M.

{¶57} Eric Thomsen testified that he found a pair of sandals placed at the entrance to his home. Thomsen's home is directly across the street from the murder. Thomsen had arrived home at 9 P.M. and the sandals were not there. He testified that the sandals had to be placed there sometime after 9:00 P.M. Further, sometime around midnight,

Thomsen heard two people talking, looked and saw two dark shadows, heard a shot and saw a flash. Thomsen found the suspicious sandals when he went downstairs to find out what was going on across the street. Forensic analysis established that Shanklin was the major contributor of the DNA recovered from the sandals. In fact forensics established that this DNA match occurred in one out of seven billion possible contributors.

{¶58} In addition, the two black socks pointed to Shanklin. One sock contained DNA consistent with Shanklin. Forensics established that the match was consistent with Shanklin within one and one trillion possible contributors.

{¶59} Within nine hours of the murder, at around 8:30 A.M. Shanklin's phone left the vicinity of Motel 6 and traveled via I-77 south back to Springfield, Illinois. The next day the cell phone account was terminated.

{¶60} A Stark County Deputy recovered the murder weapon under an I-77 overpass near Belden Village and on the same route traveled by Shanklin's phone. A forensic investigator from BCI compared the seven cartridge casings recovered from the scene and the bullet recovered from Munford's body with the Sig Sauer. The scientist testified that the bullet casings and bullet had been fired from the Sig Sauer to the exclusion of all other guns.

{¶61} At the time of the murder, Allen Walker's phone was near Meyer's Lake. All effort to find Allen Walker for further questioning has been unsuccessful. No plausible explanation was given for the presence of Shanklin's cell phone and DNA at the murder scene.

{¶62} Viewing the evidence in the case at bar in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a

reasonable doubt that Shanklin shot Munford. We hold, therefore, that the state met its burden of production regarding the identification of the shooter as Shanklin and accordingly, there was sufficient evidence to support Shanklin's convictions.

*2). Manifest Weight of the Evidence.*

**{¶63}** When an appellate court considers a claim that a conviction is against the manifest weight of the evidence, the court must dutifully examine the entire record, weigh the evidence, and consider the credibility of witnesses. *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355. The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Murphy*, 4th Dist. Ross No. 07CA2953, 2008–Ohio–1744, ¶ 31. Because the trier of fact sees and hears the witnesses and is particularly competent to decide whether, and to what extent, to credit the testimony of particular witnesses, the appellate court must afford substantial deference to its determinations of credibility. *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010–Ohio–2420, 929 N.E.2d 1047, ¶ 20, *superseded by statute on other grounds as stated in In re Z.E.N., 4th Dist. Scioto No. 18CA3826, 2018-Ohio-2208, ¶27* .

> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.

* * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978). Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact finder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer,* 4th Dist. Pickaway No. 11CA9, 2012–Ohio–1282, ¶ 24.

{¶64} Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that " 'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." Id.

**ISSUE FOR APPEAL**

*b. Whether the trier of fact court clearly lost her way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.*

{¶65} The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or

sufficiency of the evidence." *State v. Craig,* 10th Dist. Franklin No. 99AP–739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP–604, 2003–Ohio–958, ¶ 21, *citing State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP–1238, 2003–Ohio–2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), paragraph one of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997).

**{¶66}** In the case at bar, the jury heard the witnesses, viewed the evidence and heard Shanklin's statement to the police as well as his attorney's arguments and explanations about his actions. Thus, a rational basis exists in the record for the jury's decision.

**{¶67}** We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Based upon the foregoing and the entire record in this matter we find Shanklin's convictions are not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury heard the witnesses, evaluated the evidence, and was convinced of Shanklin's guilt.

**{¶68}** The jury neither lost his way nor created a miscarriage of justice in convicting Shanklin.

**{¶69}** Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crimes for which Shanklin was convicted.

**{¶70}** Shanklin's' Second Assignment of Error is overruled.

III.

**{¶71}** In the Third Assignment of Error, Shanklin argues that his counsel was ineffective for failing to request a competency evaluation. In support, Shanklin argues that discovery in this case which included a mental health report from his prior conviction in *People v. Shanklin*, McClean County Circuit Court No. 4-01-0947, Judicial Circuit, Case No. 00CR28, put counsel on notice of his mental health concerns sufficient to require counsel to request a competency evaluation. See, *Notice of Prior Conviction,* filed Jan. 25 2018. [Mental Health Report, Attached to Docket Number 25]

**STANDARD OF APPELLATE REVIEW.**

**{¶72}** In order to prevail on a claim of ineffective assistance of counsel with respect to the entry of a guilty plea, a defendant must meet the test set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). *State v. Xie,* 62 Ohio St.3d 521, 524 (1992). Specifically, the defendant must first "'show that counsel's performance was deficient,' "Id., quoting Strickland at 687, and "[s]econd, 'the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty.'" Id., *quoting Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

{¶73} "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland v. Washington*, 466 U.S. 668 at 689,104 S.Ct. at 2064.

{¶74} In light of "the variety of circumstances faced by defense counsel [and] the range of legitimate decisions regarding how best to represent a criminal defendant," the performance inquiry necessarily turns on "whether counsel's assistance was reasonable considering all the circumstances." *Strickland v. Washington*, 466 U.S. 668 at 689,104 S.Ct. at 2064. At all points, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland v. Washington*, 466 U.S. 668 at 689,104 S.Ct. at 2064.

{¶75} The United States Supreme Court discussed the prejudice prong of the *Strickland* test,

> With respect to prejudice, a challenger must demonstrate "a
> reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S.Ct. 2052.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ——, ——, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689–690, 104 S.Ct. 2052. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." Id., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it

deviated from best practices or most common custom. *Strickland*, 466 U.S.,

at 690, 104 S.Ct. 2052.

*Harrington v. Richter,* __U.S.__, 131 S.Ct. 770, 777-778, 178 L.Ed.2d 624(2011).

### ISSUE FOR APPEAL.

*Whether there is a reasonable probability the result of the case would have been different had counsel requested a competency evaluation of Shanklin.*

**{¶76}** In *People v. Shanklin*, midway through a trial in May 2000, Shanklin pled guilty to the charge of attempted murder for a 1999 stabbing. During the sentencing investigation, the court was provided with an assessment that had been conducted in 1995 and 1996 when Shanklin was 15 and 16 years old. At the time, Shanklin had been admitted to Hartgrove Hospital in Chicago, was being treated for his violent and disruptive behavior and was assessed by the psychiatric and social work staff. The Hospital report from that time concluded that Shanklin had a low intelligence quotient in the mental retarded range and a history of mental-health treatment. The diagnosis included an assessment that Shanklin had difficulty receiving and retaining verbal information. *People v. Shanklin,* Appellate Court of Illinois, Fourth District, Case No. 4-01-0947, 2-3. Shanklin's counsel did not request any further examination of Shanklin's fitness. In June of 2000, the matter proceeded to sentencing. Shanklin was ordered to serve a 19-year prison sentence. The hospital assessment did not appear to include a competency evaluation.

**{¶77}** In September of 2001, Shanklin filed a pro se petition for post-conviction relief arguing that he was unfit and incompetent when he entered his guilty plea and could not have understood the ramifications of his plea. Shanklin also alleged that his counsel

was ineffective for failing to alert the trial court that he was unfit once counsel became aware of Shanklin's mental-health history. On October 10, 2001, the trial court summarily denied the Petition.

{¶78} On appeal, the Illinois Court of Appeals found that where the facts in the hospital report raised a bona fide doubt as to Shanklin's fitness to understand and enter a guilty plea, Shanklin's counsel was ineffective for failing to request a fitness hearing. The Court further stated that at a minimum, counsel should have brought this to the trial court's attention prior to sentencing, by either requesting a hearing on Shanklin's actual fitness or asking the trial court to question Shanklin carefully as to the plea he entered and the consequences. For these reasons and by order of the court, on or about February 1, 2005, the trial court's dismissal of Shanklin's post-conviction petition was vacated and the matter was remanded for further proceedings.

{¶79} During the remand, the trial court ordered that the status of Shanklin's fitness had to be resolved before the post-conviction petition hearing. On May 6, 2006, a status report prepared by Dr. Chapman was filed. The trial court conducted a post-conviction relief hearing. During the hearing, Dr. Chapman testified consistent with his report as follows:

> In my opinion, given with a reasonable degree of medical and psychiatric certainty, based on the information available to me and examination of Ronald Rondell Shanklin that he currently suffers no mental condition that renders him unable to understand the nature of the proceedings and purposes of the proceedings against him or assist in his defense and was of the same mental condition in 2000 based on review of

the documents which included his participation and comments in court appearances and the recollection of his attorney Mr. Lawrence of RRS's capacity to cooperate with him and participate in developing a rational defense strategy. In summary, it is my opinion that he is fit currently and there is no clinical evidence to believe that he was unfit in 2000.

*See People v. Shanklin*, Circuit Court of the Eleventh District, Case No. 00 CF 28, Order filed April 21, 2008. [Attached to Docket Number 25]. After the presentation of evidence, the matter was taken under advisement. On April 21, 2008, the trial court denied the petition. On March 1, 2010, the Illinois appellate court affirmed the trial court's decision.

**{¶80}** "It has long been recognized that 'a person [who] lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *State v. Smith*, 89 Ohio St.3d 323, 329, 731 N.E.2d 645 (2000), *quoting Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). "Fundamental principles of due process require that a criminal defendant who is legally incompetent shall not be subjected to trial." *State v. Berry*, 72 Ohio St.3d 354, 359, 650 N.E.2d 433 (1995), *citing Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). (Other citation omitted.)

**{¶81}** In *State v. Bock*, 28 Ohio St.3d 108, 502 N.E.2d 1016 (1986), the Supreme Court of Ohio stated that:

The failure to hold a competency hearing is harmless error where the defendant proceeds to participate in the trial, offers his own testimony in defense and is subject to cross-examination, and the record fails to reveal sufficient indicia of incompetency.

Id. at paragraph one of the syllabus.  Subsequently, in *State v. Thomas*, 97 Ohio St.3d 309, 2002–Ohio–6624, 779 N.E.2d 1017, the court stressed that:

> [T]he decision whether to hold a competency hearing once trial has begun is in the court's discretion.  *State v. Rahman* (1986), 23 Ohio St.3d 146, 156, 23 OBR 315, 492 N.E.2d 401.  The right to a hearing rises to the level of a constitutional guarantee when the record contains sufficient "indicia of incompetency" to necessitate inquiry to ensure the defendant's right to a fair trial.  *State v. Were*, 94 Ohio St.3d 173, 761 N.E.2d 591, paragraph two of the syllabus; *State v. Berry*, 72 Ohio St.3d at 359, 650 N.E.2d 433.  Objective indications such as medical reports, specific references by defense counsel to irrational behavior, or the defendant's demeanor during trial are all relevant in determining whether good cause was shown after the trial had begun.  *State v. Chapin* (1981), 67 Ohio St.2d 437, 21 O.O.3d 273, 424 N.E.2d 317, paragraph one of the syllabus.

**{¶82}**  Id. at ¶ 37.

**{¶83}**  Incompetency is defined in Ohio as the defendant's inability to understand "* * * the nature and objective of the proceedings against him or of presently assisting in his defense."  R.C. 2945.37(A).  Incompetency must not be equated with mere mental or emotional instability or even with outright insanity.  A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel.  *Brock* at 110, 502 N.E.2d 1016; *State v. Hicks*, 43 Ohio St.3d 72, 79, 538 N.E.2d 1030, 1038 (1989).  Under R.C. 2945.37(A), a defendant is

presumed competent unless he proves incompetence by a preponderance of the evidence.

**{¶84}** In the case at bar, the record does not reveal sufficient indicia of incompetence to have required the trial court or defense counsel to request a competency evaluation of Shanklin. Counsel became familiar with Shanklin in representing him, and if they had any reason to question Shanklin's competency in any respect, they surely would have done so. *See State v. Spivey*, 81 Ohio St.3d 405, 411, 692 N.E.2d 151(1998). Shanklin has not cited in his brief in this court to any behavior by Shanklin at trial nor any testimony presented in his behalf to have provided "sufficient indicia of incompetence" to warrant a competency hearing. See *State v. Berry*, 72 Ohio St.3d 354, 359, 650 N.E.2d 433(1995). There is nothing in the record suggesting that Shanklin's mental capacity was impaired at any time during the course of the proceedings.

**{¶85}** In determining an ineffective assistance claim, our review is limited to the record before this court and there is simply nothing in the record indicating that Shanklin suffered from a mental deficiency that would have prevented him from assisting his trial counsel. There is also nothing in the record indicating that Shanklin's trial counsel failed to exercise due diligence to assure themselves that Shanklin was capable of assisting in his defense and understanding the charges so as to competently assist in his defense.

**{¶86}** Therefore, counsel was not deficient in failing to request a competency evaluation of Shanklin.

**{¶87}** Shanklin's Third Assignment of Error is overruled.

{¶88} For the foregoing reasons, the judgment of the Stark County Court of Common Pleas is hereby affirmed.

By Gwin, P.J.,

Wise, John, J., and

Delaney, J., concur